COMMONWEALTH *vs.* VIOLET AMIRAULT
(and eleven companion cases[1]).
COMMONWEALTH *vs.* GERALD AMIRAULT.

Middlesex. October 9, 1996. - March 24, 1997.

Present: WILKINS, C.J., ABRAMS, LYNCH, O'CONNOR, GREANEY, FRIED, &
MARSHALL, JJ.

*Constitutional Law,* Confrontation of witnesses, Waiver of constitutional
rights. *Witness,* Child. *Evidence,* Hearsay, Videotape. *Practice, Criminal,*
New trial, Retroactivity of judicial holding. *Waiver.*

Comparison and discussion of the confrontation clauses set forth in the
Sixth Amendment to the Constitution of the United States and art. 12
of the Massachusetts Declaration of Rights. [628-632]
Seating arrangements adopted at the trial of certain sexual abuse cases,
whereby child witnesses did not give their testimony to the defendants'
face, violated the right of the accused under art. 12 of the Massachusetts
Declaration of Rights to confront their accusers. [632]
Discussion of the limited circumstances in which a criminal defendant's
Sixth Amendment or art. 12 rights to confrontation may yield to other
important interests, including instances where certain hearsay evidence
and videotaped testimony are admitted in evidence. [633-636]
Discussion of the rules governing the retroactive application of a newly
enunciated doctrine which is raised as a basis for a criminal defendant's
motion for a new trial. [636-639]
Discussion of the doctrine of waiver as applicable to claims raised in a mo-
tion for a new trial in a criminal case. [639-641]
Where defendants in several child sexual abuse cases did not raise the issue
of special seating arrangements for certain child witnesses as constitut-
ing a denial of their right to confront those witnesses under art. 12 of
the Massachusetts Declaration of Rights, either before or at trial or in a
motion for new trial, or on direct appeals, and where cases decided prior
to the defendants' direct appeals, including *Coy* v. *Iowa,* 487 U.S. 1012
(1988), and *Commonwealth* v. *Bergstrom,* 402 Mass. 534 (1988), were
sufficient to put the defendants on notice with respect to the confronta-
tion issue, this court concluded that the issue was waived. [642-644]
O'CONNOR, J., dissenting.
Trial counsel in criminal cases were not shown to have provided ineffective
assistance of counsel by reason of their failure to object to certain seat-
ing arrangements for testifying witnesses that violated the defendants'
right under art. 12 of the Massachusetts Declaration of Rights to confront

---

[1]Four against Violet Amirault and seven against Cheryl Amirault Le-
Fave.

the witnesses against them, where, in the circumstances, the waiver of that right might be seen as a reasonable tactical decision. [645] O'CONNOR, J., dissenting.

This court declined to order a new trial in certain criminal cases on the ground that there existed a substantial risk of a miscarriage of justice arising from the defendants' waiver of their constitutional right to confront the witnesses against them, where review of the evidence and the case as a whole raised no serious doubt that the defendants' guilt had been fairly adjudicated. [645-649] O'CONNOR, J., dissenting.

Statement of what circumstances in a criminal case are necessary to establish the existence of a substantial risk of a miscarriage of justice as would warrant the grant of a new trial. [649-653]

Defendants in criminal cases did not demonstrate that, but for the lack of face-to-face confrontations with certain witnesses, there was a substantial risk that the outcome of the trial would have been different. [653] O'CONNOR, J., dissenting.

INDICTMENTS found and returned in the Superior Court Department on January 21, 1985, and September 19, 1985.

A motion for a new trial, filed on March 30, 1995, was heard by *Elizabeth J. Dolan,* J.

INDICTMENTS found and returned in the Superior Court Department, six on January 21, 1985, and six on September 19, 1985.

A motion for a new trial, filed on April 11, 1995, was heard by *Robert A. Barton,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Martin F. Murphy,* Assistant District Attorney (*Catherine E. Sullivan,* Assistant District Attorney, with him) for the Commonwealth.

*Daniel R. Williams,* of New York (*Daniel V. Finneran,* of New York, & *James L. Sultan,* with him) for the defendants.

*Scott Harshbarger,* Attorney General, & *Elisabeth J. Medvedow,* Assistant Attorney General, for the Attorney General, amicus curiae, submitted a brief.

FRIED, J. In 1986, Gerald Amirault was found guilty on eight indictments charging rape of a child and seven indictments charging indecent assault and battery on a child. We affirmed the denial of his request for a new trial in *Commonwealth* v. *Amirault,* 399 Mass. 617 (1987), and affirmed his convictions and the denial of his renewed motion for a new trial, *Commonwealth* v. *Amirault,* 404 Mass. 221 (1989).

In a separate trial arising from the same allegations of abuse at the Fells Acres Day School, Violet Amirault[2] was found guilty on two indictments charging rape of a child and three charging indecent assault and battery on a child, and Cheryl Amirault LeFave was found guilty on three indictments charging rape of a child and four charging indecent assault and battery on a child. We affirmed these convictions, *Commonwealth* v. *LeFave*, 407 Mass. 927 (1990), and vacated on appeal a judge's order revising their sentences, *Commonwealth* v. *Amirault*, 415 Mass. 112 (1993). Gerald filed a motion for a new trial on March 30, 1995, and Violet and Cheryl filed their motion for a new trial on April 11, 1995, alleging that the special seating arrangements used for the child witnesses in their original trials deprived them of their right "to meet witnesses against [them] face to face" as guaranteed by art. 12 of the Massachusetts Declaration of Rights and our recent decision in *Commonwealth* v. *Johnson*, 417 Mass. 498 (1994). Gerald Amirault's motion was denied by the judge who presided over his trial. Violet Amirault and Cheryl Amirault LeFave's motion was allowed by a motion judge who had had no connection with their original trial. We granted the Commonwealth's application for direct appellate review as to all three defendants.[3]

I

The defendant Violet Amirault directed the Fells Acres Day School where her daughter, Cheryl, worked as a teacher and her son, Gerald (generally referred to as "Tooky" in the children's testimony), worked as a bus driver, cook, maintenance man, and general assistant. On September 2, 1984, a

[2]Violet Amirault was the owner and director of the Fells Acres Day School. Gerald Amirault is her son and Cheryl Amirault LeFave is her daughter.

[3]We consider both appeals together because they raise substantially similar issues. The trial procedures challenged are nearly identical, as the procedures used to protect the child witnesses in the trial of Violet Amirault and Cheryl Amirault LeFave were directly modeled after those used in the trial of Gerald Amirault. The only significant difference between the two cases is the procedural posture in which they reach us. Gerald's motion for a new trial was heard by the judge who presided at Gerald's trial, and it was denied. The judge who presided over Violet and Cheryl's trial had retired, and their motion was heard and allowed by another Superior Court judge.

mother of one of the students made allegations of abuse against Gerald, which led to a large-scale investigation. Gerald was arrested three days later, and the school was closed shortly thereafter. Violet and Cheryl were implicated in the allegations of abuse. After the school was closed, a parents' meeting was held at the Malden police station where parents were instructed to question their children about a secret or magic room and a clown, and were made aware of symptoms which might evidence sexual abuse.

Initially, all three defendants were subject to the same prosecution, and all three were represented by the same trial counsel. In the course of pretrial motions, the Commonwealth requested severance and the defense agreed.[4]

## A

Gerald Amirault was the first of the three defendants to be tried. The Commonwealth's cases consisted primarily of the testimony of nine children who related their accounts of abuse at Fells Acres. Eight of the nine children testified in the court room, but using an altered seating arrangement. The other child's testimony was recorded on videotape and shown to the jury at a later date. We upheld that mode of testimony in Gerald's direct appeal, *Commonwealth* v. *Amirault*, 404 Mass. 221, 240-243 (1989), and summarized the evidence presented against him in great detail. *Id*. at 224-227. An identical seating arrangement was used in both trials for those child witnesses who testified in the court room. This was the seating arrangement for the child witnesses which is the subject of these petitions:

Each child witness testified at a small, child-sized table which was placed directly in front of the jury box. A microphone was placed in the center of the table into which the child was directed to answer. The defendants remained at the defense table which was positioned behind and to the side of the child witness. The Commonwealth and the defendants quibble over the specific parts of the child witness's face the defendants could view and the exact degree of the sight angles available from the defense table. There is sufficient agreement

[4]The motion to sever was allowed after Dr. Newberger's testimony, see below at 623, regarding the importance of altering the arrangement of the court room.

as to the basic features of the arrangement, and our decision does not turn on the features about which there is disagreement. The defense table was not directly behind the child witness, so some profile view was observable. The parties agree that the approximate sight angle from the nearest seat at the defense table to the child witness was approximately 112 degrees. The maximum angle from the other seats at the defense table is in dispute, but is somewhere between 128 and 145 degrees. The child witnesses were seated approximately eight to nine feet from the defendants. The motion judge who heard Violet and Cheryl's motion, declared that "[a]t best, the defendants could only see the right ear and a part of the right cheek of the testifying witness." The Commonwealth contends that the defendants could see almost a full profile view including the child's lips and that the child witness could make eye contact by turning toward the defendants.

During the child witness testimony, counsel sat at either side of the small table. The lawyer examining the child sat in the seat furthest from the defense table. If the child looked at the lawyer examining the child, he or she would have to turn his or her face away from the defendants. The judge sat next to the questioning attorney and a parent was permitted to sit approximately six feet behind the child. Thus, it is likely that the child's attention was focused away from the defense table during most of the testimony. No defendant made any effort to move to the open seat at the defense table which offered the best view of the child witnesses.

Gerald was present when each child walked into the court room. The children were aware of his presence, and the jury would have been able to see any interaction, such as eye contact or avoidance of it, between the defendant and the witnesses at that time. In addition, the judge who denied Gerald's motion for a new trial found that "[d]uring [breaks], some [children] . . . looked directly at the defendant, some expressing fear that the defendant would leave his seat and come after them." Five of the eight children testifying in the altered court room were asked to identify the defendant. Four of the children positively identified the defendant by pointing toward him, some being asked to point several times to ensure that they were, in fact, pointing to the defendant. The remaining child pointed in the direction of the defendant but refused to look at him.

Before the trials and before severance, the judge heard testimony from Dr. Eli Newberger, a pediatrician specializing in child abuse, regarding the appropriate manner by which the children should be asked to testify. In their examination of Dr. Newberger, defense counsel conceded that an altered court room arrangement would be preferable, stating, "I think we've all accepted the fact that the small, more intimate setting is the preferred setting as it potentially will be less traumatic, notwithstanding what the child is being asked to address himself to." The defense also declined on two separate opportunities presented by the judge to object to the seating on confrontation grounds. In the first instance, the judge explicitly asked defense counsel whether he was raising the confrontation issue:

THE JUDGE: "I think [defense counsel], if you try and get at the situation of would a face-to-face confrontation with the defendant be more likely to produce the truth — is that your thrust?"

DEFENSE COUNSEL: "No, your Honor."

In the second instance, defense counsel not only rejected the judge's characterization of their argument, but also ignored the judge's suggestion that confrontation was an open issue, worthy of examination:

THE JUDGE: "What you're saying is, fine, Judge, look at the trauma, look at the right of confrontation under the Sixth Amendment or [art.12], which I really think is basically here — "

DEFENSE COUNSEL: "Not quite, Judge."

THE JUDGE: " — to be determined."

DEFENSE COUNSEL: "It's not a right of confrontation issue."

The discussion that actually determined how seating would be arranged for the child witnesses was made off the record because defense counsel did not object to those arrangements.

While the defense did not question the in-court seating arrangement on confrontation grounds, it vigorously contested the use of videotaped testimony on this basis. The defendant's

motion in opposition to the use of videotape stated that art. 12 "has long been recognized as affording defendants greater protections than those provided for in the Sixth Amendment" to the United States Constitution. Arguing this point prior to trial, defense counsel noted that "[t]he Massachusetts Constitution, by its very words, guarantees a defendant a face-to-face confrontation." The defendant's motion cited liberally to *United States* v. *Benfield*, 593 F:2d 815 (8th Cir. 1979), a case favoring confrontation rights under Federal constitutional law, and noted a Kentucky case, Commonwealth *vs.* Willis, No. 84-CR-346 (Fayette Cir. Ct. 1985), and a California case, *Hochheiser* v. *Superior Court*, 161 Cal. App. 3d 777 (1984), both of which rejected testimonial alternatives which would jeopardize a defendant's confrontation rights. As noted above, we upheld the use of videotape for one child witness in Gerald's earlier appeal, relying on the fact that the defendant was present when the testimony was recorded.[5] *Amirault, supra* at 240-243.

All nine children testified in a broadly consistent way.[6] The children testified to numerous instances of sexual abuse. Some of the children testified that they were photographed during this abuse, describing a big camera with wires, a red button, and pictures which came out of the camera. The children testified that the defendant threatened them and told them that their families would be harmed if they told anyone about the abuse.

Parents and relatives of the children testified and related the circumstances in which the children's disclosures of abuse took place. These parents also testified to instances of extremely sexualized behavior on the part of the children

[5]The statute which permitted videotaped testimony at the time of Gerald's trial, G. L. c. 278, § 16D, was held to be unconstitutional in *Commonwealth* v. *Bergstrom*, 402 Mass. 534, 547 (1988), "to the extent that it violated a defendant's right to confrontation by allowing a child witness to testify outside the physical presence of the defendant." *Commonwealth* v. *Amirault*, 404 Mass. 221, 241 (1989). In Gerald's earlier appeal, we held that the videotaped testimony used in Gerald's trial stayed within constitutional bounds because the defendant "was present in the room when the child's testimony was videotaped," and the judge's findings and the totality of the circumstances convinced the court that "the judge considered the need to be compelling." *Id*.

[6]For a more detailed summary of the evidence at trial, see *Amirault, supra* at 223-226.

including masturbation, sexualized play with dolls, boys sticking their tongues in the mouths of their mothers, and the simulation of sexual acts. Many of the children also developed generalized symptoms indicative of trauma such as bedwetting, baby talk, pain in their genital areas, headaches and stomach aches, and fearfulness. The Commonwealth presented a child psychiatrist who testified as to three major points. First, she testified that children who are abused often delay revealing the abuse out of fear, guilt, or lack of trust. Second, she described the sorts of sexualized behaviors abused children can show, acknowledging that although these behaviors can be prompted by circumstances other than abuse, they do occur most frequently in abused children. Third, she related nonspecific symptoms of trauma such as bedwetting, fearfulness, and babytalk which she claimed were common in abused children.

The Commonwealth also presented a pediatric gynecologist and pediatrician who examined five of the girls who testified against Gerald. She made findings consistent with abuse in four of the girls.

Gerald testified on his own behalf and denied all the allegations against him. Twenty-two teachers, teachers' aides, and other employees of the school testified that they had free, unannounced access to all parts of the school at all hours. None was aware of any signs of abuse, had heard of a "magic room" where much of the abuse was alleged to have occurred, or had ever seen Gerald dressed as a clown or a clown costume anywhere at the school. They testified that Gerald was well liked by the children before the allegations of abuse.

The defense also presented a psychiatrist who testified that the sexualized behavior and the nonspecific symptoms of trauma could have been the result of something the children saw or were exposed to or could have been produced by other emotional trauma. He also explained what he called the "positive reinforcement loop," a theory he used to explain how improper interviewing techniques could lead to false accusations of abuse. He suggested that parental fears, combined with parental and interviewer cues and reactions during inquiry, could encourage children to respond to repeated questioning by relating accounts of abuse, fabrications, and exaggerations to obtain approval.

## B

After Gerald was convicted, Violet Amirault and Cheryl Amirault LeFave were tried together. In the Commonwealth's case four child witnesses testified against the two defendants. Each was under the age of nine, and all testified within the court room. No findings were made as to the necessity of the seating arrangement. The trial judge apparently relied on the conversations with counsel that had taken place before the two cases were severed, and copied the special seating arrangement used in the earlier trial of Gerald Amirault which was based on the recommendations in Dr. Newberger's testimony.

As in Gerald's case, the defendants did not object to the seating arrangement on confrontation clause grounds.[7] They did object to the seating arrangement on the ground that it was "done without any evidence on the record that it [was] necessary, as opposed to, for example, convenience," and that it "disfavor[ed] and prejudice[d] the defendant to a point that even instructions from the Court cannot cure that visual prejudice" which might result if this arrangement itself created the suggestion that the defendants were guilty. The judge determined that the arrangement would "facilitate the testimony" by making it easier for the jury to see and hear the witnesses, and the judge carefully instructed the jury that the arrangement's primary purpose was to ensure that the jury could hear the testimony and that no prejudicial inference should be drawn from the seating arrangement.

During the course of the testimony, the children were occasionally required to look at the defendants. One eight year old girl identified the defendants and was asked whether the distance between herself and the defendants in the court room was approximately the same as the distance between herself and the defendants during one of the instances of abuse she recounted. She responded in the affirmative. A nine year old boy was asked if the defendants were in the court room, to which he answered, "Yes. Right there." A six year old girl stated that she recognized the defendants and pointed to them in court. The transcripts reveal no other instances which required the witnesses and defendants to look at one another,

[7]The defendants were represented by the same trial counsel as Gerald Amirault. All three defendants have new counsel for these appeals.

although it is likely that the children saw the defendants when they entered and left the court room.

We have already summarized at length the evidence presented at the trial of Violet Amirault and Cheryl Amirault LeFave in an opinion rejecting their earlier appeals. *Commonwealth* v. *LeFave*, 407 Mass. 927, 928-931 (1990). The prosecution's case consisted of testimony by the four child witnesses who all testified to similar stories of threats and sexual abuse at the hands of the defendants. All three girls testified that abuse took place in a "magic room," described as a bathroom on the school's second floor which had a small, child-sized door. All four witnesses testified that they were photographed during the abuse, two describing a black camera on a tripod and the others describing a black camera with pictures that came out of its front.

The parents of several children testified that their children developed pronounced sexual behavior and regressed to infantile behaviors such as bedwetting and baby talk. The same child psychiatrist who appeared at Gerald's trial testified that these behaviors were commonly indicative of sexual abuse. The Commonwealth also presented the same pediatric gynecologist used earlier who related her findings that all three young girls exhibited physical signs consistent with sexual abuse. The doctor acknowledged that these findings were not conclusive of abuse, but testified the symptoms were more common to abused children, and it would be unusual to find three children under six years old at the same school with such symptoms. The Commonwealth also presented a United States postal inspector who specialized in the investigation of child pornography, describing common means of depicting children in such pornographic materials and the underground market for these goods. This testimony was offered to establish a motive for the abuse. See *Commonwealth* v. *LeFave, supra* at 931-938 (holding that this testimony was properly presented to the jury and relevant to the issue of motive).

The defense countered with testimony from twelve teachers or aides from Fells Acres who all testified that they had never heard of the places or witnessed the activities about which the children testified. They stated that they had seen nothing at Fells Acres which would corroborate these accounts, pointing out that they had free use and access to all parts of the

school at all times and had never perceived any indications of abuse. The defense also produced a psychiatrist who testified that it was equally probable that the sexual behavior exhibited by the children stemmed from a source other than sexual abuse. The psychiatrist and another psychologist opined that the process used to interview the children was fatally flawed, one noting that the interviewer seemed to make no attempt to distinguish fact from fantasy, and the other testifying as to faults she had documented in one of the recorded interviews. The defense also produced one of the female witness's personal pediatrician who testified that the child showed no signs of vulvitis when she was examined shortly after the closing of Fells Acres.

In 1993, we vacated the trial judge's allowance of a motion by the defendants to revise or revoke their sentences. *Commonwealth* v. *Amirault*, 415 Mass. 112 (1993). The defendants did not raise either the State or Federal confrontation clause issue, as it pertained to the seating arrangement, in any of their earlier appearances before this court.

## II

### A

Article 12 commands that "every subject shall have a right . . . to meet the witnesses against him face to face." In *Commonwealth* v. *Bergstrom*, 402 Mass. 534 (1988), we stated, in response to an argument by the Commonwealth that "these words have 'no essential meaning,' " *id.* at 541, that "[c]onstitutional language more definitively guaranteeing the right to a direct confrontation between witness and accused is difficult to imagine." *Id.* at 541-542. Nor did we think that we were saying anything new, for we quoted our decision in *Commonwealth* v. *Gallo*, 275 Mass. 320, 333 (1931), that the " 'purpose [of art. 12] was to put beyond the possibility of alteration except by the people themselves the principle already established as a part of the common law *that the witness should confront the accused face to face*' " (emphasis supplied in *Bergstrom*). *Bergstrom, supra* at 544. We also noted that:

"The Constitutions of Virginia, Pennsylvania, Delaware, Maryland, North Carolina, and Vermont contain

'to be confronted with' or 'to confront' language. The Massachusetts Declaration of Rights, which was adopted after these documents, was the first to use the language 'to meet the witnesses against him face to face.' . . . Presumably, the framers of our State Constitution were aware of the other States' provisions and chose more explicit language to convey unequivocally their meaning."

*Id.* at 541 n.9.

The *Bergstrom* case declared G. L. c. 278, § 16D, unconstitutional. This was a statute which, in certain circumstances, permitted a child witness to have his testimony electronically recorded and presented to the jury as the testimony of the child at the trial of a defendant accused of crimes such as those in these cases, and it was found to be unconstitutional insofar as it allowed this recording to occur at a session where the accused was not present. For that reason, the emphasis in that case was on the right of the accused to be present when the witness against him gives his testimony. *Bergstrom, supra* at 540-541. In the cases before us, however, that issue is not presented as the child witnesses and the accused were, with the exception of the child who testified through videotape in Gerald's trial, present together in the court room when the witness gave his testimony.

The situation in *Coy* v. *Iowa*, 487 U.S. 1012 (1988), came much closer to the facts of the instant cases. In *Coy*, the defendant was accused of sexually assaulting two thirteen year old girls. At his jury trial, the judge granted the State's motion, pursuant to a statute intended to protect child victims of sexual abuse, to place a screen between the defendant and the girls during their testimony. This device blocked the defendant from the witnesses' sight but allowed him to hear his accusers and see them dimly. The Supreme Court considered this procedure under the confrontation clause of the Sixth Amendment, which gives the accused the right "to be confronted with the witnesses against him." As we noted in *Bergstrom*, this language is more general than that of art. 12 and thus might lend itself to a less demanding interpretation. Despite its more general language, the Supreme Court in *Coy* read the confrontation clause of the Sixth Amendment just as we read art. 12 in *Bergstrom*. The Supreme Court in *Coy* went on to state the reasons, indicated by us as well, see

*Bergstrom, supra* at 542-543; *Commonwealth* v. *Johnson,* 417 Mass. 498, 503 (1994), underlying the right to confrontation, in a way that distinguishes and gives separate emphasis to the several rights implicated in both art. 12 and the Sixth Amendment: the right of the defendant to cross-examine witnesses, the right to be present and observe the witness testify, and the right to meet the accusing witness in such a way that the witness must either look upon the accused's face as he testifies or deliberately avert his eyes and look away from him.

> "[A]s Justice Harlan put it, '[s]imply as a matter of English' it confers at least 'a right to meet face to face all those who appear and give evidence at trial.' *California* v. *Green,* [399 U.S. 149, 175 (1970)]. Simply as a matter of Latin as well, since the word 'confront' ultimately derives from the prefix 'con-' (from 'contra' meaning 'against' or 'opposed') and the noun 'frons' (forehead). Shakespeare was thus describing the root meaning of confrontation when he had Richard the Second say: 'Then call them to our presence — face to face, and frowning brow to brow, ourselves will hear the accuser and the accused freely speak . . . .' Richard II, Act 1, sc. 1. . . .

> "The State can hardly gainsay the profound effect upon a witness of standing in the presence of the person the witness accuses, since that is the very phenomenon it relies upon to establish the potential 'trauma' that allegedly justified the extraordinary procedure in the present case. That face-to-face presence may, unfortunately, upset the truthful rape victim or abused child; but by the same token it may confound and undo the false accuser, or reveal the child coached by a malevolent adult. It is a truism that constitutional protections have costs."

*Coy* v. *Iowa, supra* at 1016, 1020.

Just two years later, the reservations that the concurring and dissenting Justices expressed in *Coy* became the opinion of the Court, and the Sixth Amendment's confrontation right was deemed to be satisfied by "[t]he combined effects of these elements of confrontation — physical presence, oath, cross-examination, and observation of demeanor by the trier of fact

— [which] serve[] the purposes of the confrontation clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings." *Maryland* v. *Craig,* 497 U.S. 836, 846 (1990). Perhaps the Court in *Craig* was justified in treating the Sixth Amendment as stating a set of general desiderata that might be served in a variety of ways and adjusted to the circumstances of the particular case — particularly so where the rule would be imposed on the several States with their various constitutional texts and traditions. But we are not free to treat art. 12 in the same way. The Sixth Amendment's confrontation clause is stated in brief and abstract terms. The Court in *Coy, supra* at 1016, was, after all, forced to proceed by an etymological analysis of the Latin roots of the English word "confrontation," and so to arrive at the picture of a meeting face-to-face, which then resonates with all the history it invoked. But art. 12 does not invite us to proceed by abstractions and by a weighing of values to be served by alternative ways of proceeding. Article 12 uses the very language which the Court in *Coy* was forced to infer. There were few texts that those who wrote and those who adopted art. 12 knew better than the Bible and Shakespeare. And so Festus's biblical proclamation that, " '[i]t is not the manner of the Romans to deliver any man up to die before the accused has met his accusers face to face, and has been given a chance to defend himself against the charges,' Acts 25:16," *Coy, supra* at 1015-1016, and the words of King Richard must have been ringing in their ears when they invoked the very words "meet the witnesses against him face to face."

When the Declaration of Rights speaks to us with such unmistakable insistence, we are not free to ignore it nor to mitigate its rigors by balancing countervailing considerations and approving alternatives that may seem to serve the values behind those words well enough. This is not to say that the mode of proceeding required by art. 12 is the only fair and decent way of going about the trial of a criminal accusation. So long as an amendment stays within the general bounds drawn by the Supreme Court in *Craig,* the people of the Commonwealth — as did the people in Pennsylvania and Illinois

— are free to amend our Declaration of Rights to permit the accommodations urged by the prosecution.[8]

We have no doubt that the seating arrangements in these cases violated the confrontation rights of the accused under art. 12. All arguments about whether the angles permitted a sufficient view of the testifying child's eyes and lips miss the point. The Commonwealth emphasizes these arguments as if the only value at stake were the ability of the accused to observe the testifying witness and the clues the accused might gather from such observation to assist in his defense. But we have made it clear that this is but one of the values served by art. 12. The witness must give his testimony to the accused's face, and that did not happen here. Moreover, it is a nonsequitur to argue from the proposition that, because the witness cannot be forced to look at the accused during his face-to-face testimony, that therefore this aspect of the art. 12 confrontation right is dispensable. The witness who faces the accused and yet does not look him in the eye when he accuses him may thereby cast doubt on the truth of the accusation. See *Coy* v. *Iowa, supra* at 1019; *Commonwealth* v. *Kater,* 409 Mass. 433, 446 (1991). The child witnesses in these cases did not testify to the face of the accused. Though they were aware of the presence of the accused, the arrangement was such — and deliberately so — that they could testify quite comfortably and naturally without ever having the accused in their field of vision. And on this point, whether the defendants took one seat or another of the seats open to them at the defense table is quite irrelevant.[9]

---

[8]After their respective courts held that the original face-to-face language contained within their confrontation provisions prohibited the use of technological testimonial procedures which prevented the witness from seeing the defendant while testifying, both Pennsylvania and Illinois amended their Constitutions. See *Commonwealth* v. *Ludwig,* 527 Pa. 472, 473 (1991) (the use of closed-circuit television which allowed the defendant to see the witness but kept the witness from seeing the defendant did not comport with Pennsylvania Constitution's call for face-to-face confrontation); *People* v. *Fitzpatrick,* 158 Ill. 2d 360, 365 (1994) (invalidated similar closed-circuit testimonial procedure under Illinois Constitution's face-to-face language).

[9]In *Commonwealth* v. *Conefrey,* 410 Mass. 1 (1991), this court noted the fact that a complainant was seated so that she could testify while facing away from the defendant at a forty-five degree angle. She was not required to face the defendant and was allowed to avoid eye contact. *Id.* at 14. Referring to its earlier decision in *Commonwealth* v. *Kater,* 409 Mass. 433,

## B

In *Bergstrom, supra* at 545-546, we "recognized narrow circumstances in which a defendant's Sixth Amendment or art. 12 rights must yield to unique interests . . . the right to confront witnesses is not absolute." Accord *Commonwealth* v. *Johnson, supra* at 503 ("the right to confrontation . . . may yield in appropriate, although limited, circumstances"). In *Coy, supra* at 1020, too, the Supreme Court conceded that "[i]t is true that we have in the past indicated that rights conferred by the Confrontation Clause are not absolute, and may give way to other important interests." At stake is the validity of the various rules allowing the introduction of hearsay evidence, as well as of devices such as videotaped testimony taken in the presence of the accused and offered to the jury at a later time. See *Commonwealth* v. *Dockham*, 405 Mass. 618 (1989); *Commonwealth* v. *Tufts*, 405 Mass. 610 (1989). As to hearsay evidence, the court in *Bergstrom, supra*

---

445-447 (1991), the court approved the seating arrangement in a summary manner, adding "only that if a special seating arrangement is allowed [at retrial], the judge should take care to ensure that the jury [do] not draw an inference of guilt from the arrangement." This decision was not questioned in *Commonwealth* v. *Johnson*, 417 Mass. 498 (1994), for we seemed to refer to it as if it merely stood for the same proposition contained in *Commonwealth* v. *Kater, supra*, thus implicitly distinguishing it from arrangements that prevent a witness from viewing the defendant:

> "To be sure, a witness cannot be compelled to focus his gaze on the defendant or to maintain eye contact while testifying. *Commonwealth* v. *Kater*, 409 Mass. 433, 446 (1991). See *Commonwealth* v. *Conefrey*, 410 Mass. 1, 14 (1991). Ordering a witness to make eye contact with a defendant is quite different, however, from permitting a witness to sit so that no eye contact or observation of the witness's face by the defendant is possible. In the former case, the confrontation is 'face to face,' even though it is not 'eyeball to eyeball,' and thus satisfies art. 12. *Kater, supra.*"

*Commonwealth* v. *Johnson, supra* at 502.

We now realize that our reference to angles in the *Conefrey* case, which was decided after the direct appeals in these cases, has encouraged the scenario presently before us in which the parties discuss the right of confrontation by presenting arguments which dispute the precise angles of view the seating at trial provided. We now state unequivocally that the right of confrontation in our Declaration of Rights simply requires a judge to refrain from designing seating configurations which comfortably shield a witness from a face-to-face meeting.

at 545, quoting *Ohio* v. *Roberts*, 448 U.S. 56, 65 (1980), and
*Commonwealth* v. *DiPietro*, 373 Mass. 369, 377 (1977), was
careful to limit the range of exceptions: either the declarant
must be "unavailable to testify during the trial [and the state-
ment must be] imbued with such trustworthiness and indicia
of reliability that 'there is no material departure from the rea-
son of the general rule,'" or the statement of an unavailable
declarant must fall within " 'an acknowledged exception[] to
the face to face rule of evidence' at the time of the State
Constitution's adoption, e.g., public records or dying declara-
tions."[10] Beyond that, the court prudently left open the pos-
sibility of exceptions in "limited circumstances," *id.* at 546,
but emphasized the need for particularized findings of need
on a case-by-case basis and rejected the validity of "broad
categorical exemptions" based on classes of crimes such as
sexual abuse or classes of witnesses such as child witnesses.[11]
*Id.* at 548. *Coy* makes a similar point. *Id.* at 1021 (individual-

[10]The introduction of hearsay declarations by child victims of sexual
abuse was discussed in *Commonwealth* v. *Colin C.*, 419 Mass. 54 (1994),
and *Opinion of the Justices*, 406 Mass. 1201 (1989), in which we considered
the constitutionality of G. L. c. 233, § 81. That provision would allow the
admission of such testimony as hearsay if, among other reasons, the child
declarant was "unavailable." The provision goes on to include in the defini-
tion of unavailability that "the court finds, based upon the expert testimony
from a treating psychiatrist, psychologist, or clinician, that testifying would
be likely to cause severe psychological or emotional trauma to the child."
G. L. c. 233, § 81 (*b*) (5). Because of the several subsidiary findings that
the judge would be required to make and the particularized showing of
harm and need amounting to a compelling interest, the court was unwilling
to say that the procedure under the statute was facially unconstitutional.
We also note that hearsay testimony, although it shares many of the features
of videotaped testimony or the testimony offered in these cases, in that the
accused's right of confrontation is compromised, is not identical to it. On
one hand it might be said that the admission of hearsay cuts even more
deeply against the confrontation right, because there is no opportunity to
cross-examine the declarant. On the other hand, because the child accuser's
declaration is offered at one remove, through the testimony of another wit-
ness, it lacks the impact and immediacy that screened or videotaped
testimony might have, and because the witness through whom the testimony
is presented is subject to cross-examination, the declaration may thus be at-
tacked both directly and indirectly.

[11]The *Bergstrom* court did mention prison disciplinary proceedings as a
"narrow circumstance[] in which a defendant's Sixth Amendment or art.
12 rights must yield to unique interests." *Commonwealth* v. *Bergstrom*, 402
Mass. 534, 545 (1988). In any event we do not regard such hearings as

ized findings necessary, though not sufficient, condition for exceptions).

We agree with the defendants that no such particularized findings were made in these cases. The testimony of Dr. Newberger was far too general to satisfy this demanding constitutional standard. Dr. Newberger did not interview the child witnesses but instead limited himself to generalities concerning children's testimony in sexual abuse cases. Neither the vulnerabilities of the particular witnesses nor the need of the accused for protection from invented, suggested, or coached testimony were considered.

There is, of course, no reason why special arrangements encompassing more intimate, less intimidating settings for the child's testimony may not be devised: the number of persons present may be limited, the judge may sit at the same level as the other participants and not wear robes, special furniture may be used such as child-sized chairs and tables, the child's parent or a favorite toy may be placed near the witness. See *Commonwealth* v. *Bergstrom, supra* at 553 ("a judge may require that the environment in which a witness is to give testimony be made less formal and intimidating"). In all such arrangements the accused may still meet the child witness face to face, and the jury may gauge the effect of such an encounter.

Of greater concern are those arrangements where the child's testimony is recorded on videotape and then presented to the jury. We have already noted that, where the witness is not subject to cross-examination or the testimony is given out of the presence of the accused, the violation of art. 12's mandate is palpable, unless the witness is unavailable or excused by some recognized exception such as the dying declaration. See *supra* at 633-634. But even where the witness's testimony is given in a manner which conforms in every respect to what ideally should happen in a proper confrontation within the court room when it is recorded, there is still the difficulty that, although the confrontation between accused and accuser takes place at the time of the accusation, the jury may not witness that confrontation, but only its effect, if any, on the accusing witness. See *Commonwealth* v. *Tufts, supra* at 617 (videotape did not show the defendants, leading us to remark

criminal proceedings for these purposes. See *Commonwealth* v. *Forte*, 423 Mass. 672, 676 (1996).

that "[i]t would have been better if jurors could have observed
the reactions of the defendants to the child witness's testimony
during the videotaping"). See also *Commonwealth* v. *Amirault*,
404 Mass. 221, 242 (1989) ("Ideally, all persons present in
the room during the taping would be visible in the videotape").
Perhaps techniques are available to make up even for this
defect although it is doubtful that any two-dimensional repre-
sentation could ever convey all the activity available to the
live observer.

Yet we have recognized and do recognize that videotaped
testimony may on occasion be appropriate. In *Commonwealth*
v. *Tufts, supra,* for instance, the witness, a child of four years,
simply could not be made to testify in the court room but
would talk outside the court room. Even if such need exists,
and there must be a particularized finding to that effect, see
G. L. c. 278, § 16D (*b*) (1), the judge must assure that the
setting of the videotaping approximates as closely as possible
the conditions that would obtain in a traditional court room
confrontation. Moreover, the jury should be made aware of
the setting at the videotaping, perhaps by a presentation,
repeated from time to time, in which the whole setting and
the positions of the participants are shown on the screen. See
*Commonwealth* v. *Amirault, supra* at 242, quoting *Com-
monwealth* v. *Bergstrom, supra* at 549 n.16 ("in constitutional
terms, a videotape should be required to convey to the jury
. . . the totality of the circumstances involved in the giving
of testimony"). But we need not go into greater detail on this
score, because insofar as the present appeals may encompass
the one witness in Gerald's trial who did testify on videotape,
we reaffirm our decision in *Commonwealth* v. *Amirault*, 404
Mass. 221, 241-243 (1989), that the videotaping procedure
used comported with our constitutional requirements.

### III

### A

The condemnation and punishments of the criminal justice
system are awesome and devastating. That is why their
imposition is hedged about with presumptions and procedural
safeguards that heavily weight the risk of error in favor of the
accused and are designed to assure both the appearance and
the reality that the accused had every fair opportunity of

defense. But once the process has run its course — through pretrial motions, trial, posttrial motions and one or two levels of appeal — the community's interest in finality comes to the fore. The regular course of justice may be long, but it must not be endless. See *Commonwealth* v. *Deeran*, 397 Mass. 136, 142 (1986). When a serious crime has been committed, the victims and survivors, witnesses, and the public have an interest that the guilty not only be punished but that the community express its condemnation with firmness and confidence. Moreover, a decision to reopen a matter long since adjudicated will often in effect resolve the dispute in favor of the accused because witnesses will have died, disappeared, their memories faded, or they may simply be unwilling once again to undergo the ordeal of testimony. *Commonwealth* v. *Curtis*, 417 Mass. 619, 623 (1994). On the other hand, we cannot rid ourselves by process alone of the possibility of error and of grave and lingering injustice. In our system the motion for a new trial, which can be made at any time even decades after the initial adjudication, responds to this need. See Mass R. Crim. P. 30, 378 Mass. 900 (1979). But in accommodating these two conflicting thrusts, once the regular procedures have run their course the presumption tilts heavily toward finality. See *Commonwealth* v. *Tucceri*, 412 Mass. 401, 406 (1992) ("[n]ew trials should not be granted except for substantial reasons"). The mere fact that, if the process were redone, there might be a different outcome, or that some lingering doubt about the first outcome may remain, cannot be a sufficient reason to reopen what society has a right to consider closed.

Two sets of rules, relevant to the cases before us, address those circumstances where a new trial will be granted and express the balance we have struck between the needs of finality and the claims of substantial justice. One set of rules concerns those instances in which a newly enunciated doctrine will be applied retroactively so as to reopen adjudications that may have been entirely regular at the time they were made. The other set concerns those instances in which a defendant is foreclosed from raising an objection because, while he might have raised it earlier and thus had it resolved during the normal course of adjudication, he does not raise it until after the regular process has already run its course. This is the doctrine of waiver. Both sets of rules invoke a similar

notion: How new and surprising is the doctrine whose benefit the defendant now seeks when he asks for a new trial?

In deciding whether a new doctrine shall be applied retroactively, once the regular course of adjudication has been completed, the novelty of the doctrine ordinarily cuts against its retroactive application: we simply ask whether the process was correct and regular according to the rules in force at that time, see *Commonwealth* v. *Bray,* 407 Mass. 296, 300 (1990) (new rules should not apply retroactively "unless they fall within either of two very limited exceptions"), citing *Teague* v. *Lane,* 489 U.S. 288, 311 (1989), lest every development in the law entail a wave of new trials of matters long since closed, see *Teague* v. *Lane, supra* at 310, and therefore inhibit progress in the law and the clarification of existing principles.[12] Accordingly, a new rule is only applied "if it places 'certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe'" or addresses a procedure of "fundamental fairness" which is "implicit in the concept of ordered liberty" and "without which the likelihood of an accurate conviction is seriously diminished." *Commonwealth* v. *Bray, supra* at 300, quoting *Teague* v. *Lane, supra* at 311, 312-313. Because the exceptions to this preclusive general principle of nonretroactivity are defined very tightly, the definition of a new rule is broadly inclusive. A rule counts as new for this purpose even if it is the logical extrapolation of a principle already stated in prior decisions. See *Commonwealth* v. *Bray, supra* at 302-303 (a rule is new if not "dictated" by existing precedent); *Teague* v. *Lane, supra* at 301.[13]

The concept of novelty is stringently defined in just the other way when it comes to deciding whether a defendant should have anticipated some evolving doctrine and utilized the opportunities within the regular course of his proceedings to raise that claim. For the doctrine of waiver, novelty is defined narrowly. *Commonwealth* v. *Bowler,* 407 Mass. 304, 308 (1990) (defendant "fairly on notice" of issue in spite of

---

[12]This is in contrast to the doctrine that a constitutional rule will ordinarily be given full retroactive effect in any case still open on direct appeal. *MacCormack* v. *Boston Edison Co.,* 423 Mass. 652, 656-658 (1996).

[13]For a sharp criticism of the *Teague* new rule doctrine, see Meyer, "Nothing We Say Matters": *Teague* and New Rules, 61 U. Chi. L. Rev. 423 (1994).

the fact that later case deciding that issue "is considered 'new' for the purpose of retroactivity analysis"). Here the concern for finality demands that a defendant present every claim and argument he might fairly have had available to him the first time around, and not after the proceeding has run its course — perhaps, as here, many years after it has run its course.

Whether our emphatic embrace of the literal meaning of art. 12 in *Commonwealth* v. *Bergstrom, supra,* or the Supreme Court's interpretation of confrontation under the Sixth Amendment in *Coy* v. *Iowa,* 487 U.S. 1012 (1988), represented a "new" rule for the purpose of the *Bray-Teague* retroactivity analysis is a question we need not resolve, because as both *Commonwealth* v. *Bray, supra,* and *Teague* v. *Lane, supra,* make clear, a doctrine, novel or not, which goes to the fundamental fairness of the prior proceedings must be given retroactive effect. We need not pause long to demonstrate that art. 12 addresses a fundamental right of the accused. Our reaffirmation of that right here and our review in *Bergstrom* are forceful enough to make that point.

B

However fundamental the right, absent extraordinary circumstances where there has been ineffective assistance of counsel or where allowing the conviction to stand "will result in 'manifest injustice,' " *Commonwealth* v. *Watson,* 409 Mass. 110, 114 (1991), quoting *Fogarty* v. *Commonwealth,* 406 Mass. 103, 110 (1989), the defendant who had a fair opportunity to raise it may not belatedly invoke that right to reopen a proceeding that has already run its course. *Commonwealth* v. *Bowler, supra* at 307. If he had an opportunity to invoke the right and failed to avail himself of it, the claim is waived and may not be raised for the first time on collateral review. The test for waiver is whether "the theory on which his argument is premised has been sufficiently developed to put him on notice that the issue is a live issue. Counsel need not be 'clairvoyant.' " *Id.,* and cases cited. *DeJoinville* v. *Commonwealth,* 381 Mass. 246, 251 (1980) (cases decided prior to appeal did not "provide[] sufficient guidance so that the petitioner can be said to have had a genuine opportunity to raise his claim at that time").

Before proceeding to consider whether the defendants have

waived their confrontation clause claim, we must put to rest a possible confusion that may exist where, as occurred in both of the cases before us, a motion judge chooses to consider an issue on its merits in a motion for a new trial, even though that issue could have been and should have been raised at the trial or on direct appeal. The statement has been made that such a consideration — favorable or unfavorable — resurrects the otherwise defunct grounds for complaint so that it is "preserved for appellate review as if brought on direct appeal."[14] *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 18 (1986), quoting *Commonwealth* v. *Buckley*, 17 Mass. App. Ct. 373, 374 (1984). See *Commonwealth* v. *Curtis*, 417 Mass. 619, 624-625 (1994).

When a new trial motion judge chooses to consider an issue on its merits, we have determined that an appellate court shall review it under the same standard motion judges are instructed to use: the "power to give relief from . . . waiver . . . should be exercised only in those extraordinary cases where, upon sober reflection, it appears that a miscarriage of justice might otherwise result." *Id.* at 626, quoting *Commonwealth* v. *Harrington*, 379 Mass. 446, 449 (1980). *Commonwealth* v. *Martinez*, 420 Mass. 622, 624 (1995). The doctrine of waiver is a doctrine devised by this court for reasons which, as we have explained, go to the balance between the full realization of a defendant's rights and the community's interest in the finality of criminal judgments. The purpose of this doctrine would be greatly undermined if a motion judge could render it a nullity by choosing to brush past it in his move to the merits — whether, as these cases illustrate, to reject or to affirm the claim. Recently we have made it quite clear that, at least as to nonconstitutionally based issues, no

---

[14]The motion judge who granted Violet and Cheryl's motion for a new trial addressed the issue of waiver and found none. In the alternative, he held that, even if there was waiver, it should not bar the grant of a new trial because the lack of confrontation caused a substantial risk of a miscarriage of justice. The trial judge had retired; this judge had not been involved in Violet and Cheryl's trial.

The judge who denied Gerald's motion for a new trial was the same judge who presided over Gerald's trial. She did not address the issue of waiver but instead distinguished the seating arrangement at Gerald's trial from the one that had been used and invalidated in *Commonwealth* v. *Johnson*, 417 Mass. 498 (1994). She found that there was no substantial risk of a miscarriage of justice.

such unreviewable and unilateral power of resurrection exists. *Commonwealth* v. *Curtis, supra* at 623-626.

There remains the question whether our decision in *Curtis* can logically be confined to nonconstitutional issues. Such a position, we think, would rest on confusion between constitutionally based objections and objections that lead to a "manifest injustice." Not all grounds for objection that in a particular case might lead to a fundamental miscarriage of justice are of constitutional dimensions, and, as we show below in Part IV, not all constitutionally based grounds for objection, if forfeited because they have been waived, necessarily lead to such a miscarriage of justice. To be sure such a miscarriage is more likely in the latter than the former, which may explain why there may be a tendency to conflate the two. But they are distinct nonetheless and a separate exception for constitutional matters "would be likely to swallow the rule, because many, if not a majority, of the errors alleged to have occurred at trial currently are argued on appeal as deprivations of constitutional right." *Commonwealth* v. *Miranda, supra* at 18-19.[15] It is clear that the doctrine of waiver "applies equally to constitutional claims which could have been raised, but were not raised on direct appeal or in a prior motion for a new trial." K.B. Smith, Criminal Practice and Procedure §§ 2070, 2084 (Supp. 1996). See *Commonwealth* v. *Deeran*, 397 Mass. 136, 142 (1986). Of course, there is ample reason to allow a motion judge to consider the essentially case-specific issue of whether there has been a miscarriage of justice on a highly discretionary standard, particularly if it is the same judge who conducted the original trial. *Commonwealth* v. *Tucceri*, 412 Mass. 401, 409 (1992). But the doctrine of waiver is a doctrine of law and can only be dispensed with in a lawful manner, appropriately subject to appellate review.

---

[15]A constitutional right is, in most cases (and certainly in this one), a right to insist that things be done in a certain way, but it is not a right that they be done in that way if the defendant does not choose to insist. Thus it is incorrect to say that there has been a constitutional error in these cases or a denial of a constitutional right at all: a right that must be claimed is not denied if it is not claimed, and the proceeding in which the claim is not made is, in that respect, wholly free from error. See *Commonwealth* v. *Cook*, 371 Mass. 832, 833 (1977); *Commonwealth* v. *Bermudez*, 370 Mass. 438, 443 (1976). There are exceptions to this general rule, but this is not one of them.

In these motions the defendants complain that the special seating arrangements did not give them the kind of face-to-face confrontation art. 12 requires, and we agree. But neither at their trials, nor on a motion for a new trial by Gerald, nor on their later direct appeals did the defendants raise this art. 12 complaint brought now, over six years after the decisions rendered in the direct appeals.[16] Both at trial and on appeal, the defendants had ample opportunities to raise confrontation issues regarding the special seating arrangement, without needing clairvoyant foresight. See *Commonwealth* v. *Bowler*, 407 Mass. 304, 307 (1990). They not only participated in altering the court room seating arrangements, but also ignored several opportunities to raise objections based on confrontation grounds.[17]

The record makes it clear that the defendants were aware of the debate surrounding confrontation issues and child witnesses. This knowledge is evidenced by the objections defense counsel raised to the use of videotaped testimony prior to both trials, in which they declared:

> "The Massachusetts Constitution, Article 12 of the Declaration of Rights, has long been recognized as affording a defendant, with regard to the issue of confrontation, greater protection than does the Federal Constitution. The Massachusetts Constitution, by its very words, guarantees a defendant a face-to-face confrontation."

These motions opposing the use of videotape also raised concerns surrounding credibility and the jury's opportunity to observe interaction between the witness and the defendant which are identical to the types of concerns raised in this appeal, demonstrating that there was an awareness at trial that the right of confrontation encompassed more than a defendant's privilege to be present during testimony. Moreover, in the preliminary hearing which addressed children's testimony and took place prior to severance, defense counsel raised concerns that seemed to address the defendants' confrontation rights. In two instances, the judge asked defense counsel

---

[16]Both in its brief opposing the defendants' motions for a new trial before the motion judges and in this court, the Commonwealth has vigorously pressed the waiver argument.

[17]The colloquy we quote above at 623, took place before the two cases were severed and thus the waiver implicit there applies to all defendants.

directly whether they were raising confrontation rights under the Sixth Amendment or art. 12, opining that these rights might still be open to determination. Both times, defense counsel rejected this characterization of their concerns. See *supra* at 623. Additionally, on Gerald's appeal, defense counsel alleged that the seating arrangement was prejudicial to the defendant and that it interfered with his right to counsel. In response, the Commonwealth's brief noted that the defendant was not arguing that the seating "violated his confrontation rights under the Massachusetts Declaration of Rights or the United States Constitution," and that any future argument on this point must therefore be deemed waived. Although it is difficult to imagine clearer language that would put the defendant on notice of the issue at hand, Gerald's defense counsel, in his reply brief, chose not to respond to this statement in the Commonwealth's brief.

Apart from the specific actions taken, or not taken, by defense counsel, we conclude that the cases decided prior to the defendants' appeals provided sufficient guidance and, in light of those cases, it would not have required clairvoyance to raise this claim, particularly at the time of the defendants' appeals. The *Bergstrom* case was decided on June 13, 1988, and the *Coy* case was decided two weeks later, on June 29, 1988. Gerald Amirault's appeal was argued on December 6, 1988, and Cheryl LeFave's and Violet Amirault's appeals were argued on March 8, 1990. *Craig* v. *Maryland*, 497 U.S. 836 (1990), which severely qualifies *Coy*, was not decided until June 27, 1990. Thus *Coy*'s Sixth Amendment face-to-face confrontation requirement was the law of the land at the time of both appeals.

*Commonwealth* v. *Bergstrom, supra,* supplied the defendants with the substance of the confrontation argument they now make, although it is not on all fours with these cases. As we have explained, *Bergstrom* concerned videotaped testimony which was taken outside the presence of the defendant and later offered to the jury pursuant to an earlier version of G. L. c. 278, § 16D. The particular defect in *Bergstrom* was the defendant's physical absence during the witness's live testimony. In that sense any statements extending to the procedures employed here are, strictly speaking, dicta. But we have never held that only a holding on an issue squarely on point will suffice to invoke the doctrine of waiver. If

anything so precise and rigorous were intended we would not have chosen phrases like "fairly on notice," "genuine opportunity," "sufficient guidance," and "clairvoyan[ce]." See *Commonwealth* v. *Bowler, supra* at 307, 308; *DeJoinville* v. *Commonwealth,* 381 Mass. 246, 251 (1980); *Commonwealth* v. *Rembiszewski,* 391 Mass. 123, 126 (1984). *Bergstrom* stated that "[a]bsent compelling circumstances, a jury ought to be able to view the interaction between a witness and others who are present. The subtle nuances of eye contact, expressions, and gestures between a witness and others in the room are for the jury to evaluate." *Id.* at 550. Although this was said in the context of videotaped testimony, it hardly required clairvoyance to apply this statement to a seating arrangement where no such "interaction" or "eye contact" could take place with the defendant unless the witness turned around to face him.

After *Bergstrom,* the Supreme Court's decision in *Coy* should have more than put the defendants on notice of a viable claim based on departures from the literal meaning of art. 12. Whatever lack of clarity and focus might be attributed to the generalities proclaimed in *Bergstrom* cannot plausibly be found in the ringing phrases of *Coy.* Because the mandates of the Sixth Amendment were applicable to a State proceeding, and because the strictures of art. 12, as *Bergstrom* and the defendants themselves previously pointed out, *id.* at 541 n.9, could be no less demanding on this score, the prominence of this ground of objection is inescapable. This point is dug in deeper by the fact that the *Bergstrom* court specifically noted that the Supreme Court of Iowa in *Coy* had "labeled as 'dispensable' the demeanor aspect of the confrontation guarantee, stating further that it was 'not constitutionally significant that [the defendant] was able to see and hear the [witnesses],' " *id.* at 547 n.14, and gave what, in retrospect, is surely the broadest of hints: that the Supreme Court had granted certiorari in *Coy,* even referring to reports of the oral argument which took place in that Court. *Id.* at 540 n.8, 547 n.13.

In sum, the generalities in *Bergstrom* and even more so the statement of the law in *Coy* were sufficient to put the defendants on notice that the objection they raise now presented a live issue at that time and it required no clairvoyance to read it there.

We do not suggest, as the defendants' new counsel invites us to do, that the original defense counsel in these cases were ineffective. Indeed they were experienced and mounted vigorous defenses, but the focus of their objections was elsewhere.[18] Furthermore, like the constitutional right of the accused to testify in his own behalf, confrontation is not always an advantage to the accused: if the witness is firm as he confronts the accused, this may add to his credibility; while the very upset or even terror a child may show when confronted by the person he accuses may tell powerfully against the accused. Experienced and competent counsel might well have concluded that it was to the defendants' advantage to keep the emotional temperature as low as possible by not insisting on confrontation.[19]

## IV

There remains the question whether, in spite of the defendants' failure to raise their valid confrontation clause claims on appeal from their convictions, nevertheless "we [should] employ [a] rarely used power . . . so that there may

[18]In considering waiver, we are entitled to consider the defense's apparent lack of interest in this issue. See *Commonwealth* v. *Grace*, 381 Mass. 753, 760 (1980) ("[t]he repeated failures of counsel to raise the point suggest that it was not thought to be critical").

[19]Inherent in the adversary system is the imperative that choices made by counsel are binding on the defendant. See, e.g., *Commonwealth* v. *Smith*, 403 Mass. 489, 493 (1988) ("general rule that a defendant is bound by his or her counsel's agreements"); *Commonwealth* v. *Fudge*, 20 Mass. App. Ct. 382, 390 (1985) (defendant bound by counsel's tactical judgments); *Commonwealth* v. *McCants*, 20 Mass. App. Ct. 294, 300-301 (1985) ("informed defendant cannot expect to accept the lawyer's services, refrain from signaling dissatisfaction, and be able to contend later that he should not be bound by selected representations that the lawyer has made").

Nor do we suggest that waiver only occurs when counsel deliberately chooses to forgo a claim for tactical reasons or that inadvertent waiver is always ineffective assistance of counsel. See *Murray* v. *Carrier*, 477 U.S. 478, 489 (1986). The Supreme Court has recognized that a State's procedural rules, such as waiver "serve vital purposes at trial, on appeal, and on state collateral attack," *id.* at 490, and that "the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment." *Strickland* v. *Washington*, 466 U.S. 668, 697 (1984). When counsel fails to raise a claim on appeal, it is still appropriate to "hold defendants to the errors of their attorneys," *Murray* v. *Carrier, supra* at 489, 492 (requiring defendants to show cause and prejudice for procedural defaults on appeal).

be a new trial." *Commonwealth* v. *Freeman,* 352 Mass. 556, 564 (1967), citing *Commonwealth* v. *Conroy,* 333 Mass. 751, 756-757 (1956). This "rarely used power" is invoked to avoid a substantial risk of a miscarriage of justice. *Freeman, supra.* See *Commonwealth* v. *Bowler,* 407 Mass. 304, 305 (1990) (no review where failure to preserve issue not excused and "no substantial risk of a miscarriage of justice" existed); *Fogarty* v. *Commonwealth,* 406 Mass. 103, 107 (1989), quoting *Commonwealth* v. *Harrington,* 379 Mass. 446, 449 (1980) (power restricted to "extraordinary cases"). Our power to upset a completely adjudicated conviction on this ground is an extraordinary one which should only be exercised in the most unusual circumstances.[20] See *Commonwealth* v. *Crawford,* 417 Mass. 358, 364 (1994) (power is "rarely exercised, and is exercised only in response to a serious and obvious error"). Pursuant to this extraordinary power, a motion judge may grant a new trial on this ground even if the grounds of that injustice include claims that might have been but were not raised at trial or on direct appeal. *Commonwealth* v. *Curtis,* 417 Mass. 619, 626 (1994). If a motion judge exercises that power, we may review its exercise here, and if the motion judge was also the trial judge we give the motion judge's determination added deference. *Id.* In Gerald's case the motion judge was the trial judge, and she denied relief. Her decision, however, was based on an incorrect determination that the seating arrangement used complied with art. 12. In Violet and Cheryl's motion for a new trial, the motion judge was not the trial judge and he allowed their motion.

In these cases we would only order a new trial on the ground that there is a substantial risk of a miscarriage of

---

[20]It is important to note that, while the language under this standard is similar to the "substantial likelihood of a miscarriage of justice" language sometimes employed in reviewing convictions of murder in the first degree under G. L. c. 278, § 33E, the standard of review is different. Under § 33E this court has a broader duty, as it is enjoined by the Legislature to consider the entire case in light of the law and the evidence and may order a new trial for any reason "that justice may require." Although we have often used the locution of a "substantial risk of a miscarriage of justice" both in § 33E cases and in new trial cases, see, e.g., *Commonwealth* v. *Torres,* 420 Mass. 479, 486-488 (1995); *Commonwealth* v. *Ferreira,* 417 Mass. 592, 597 (1994), outside of a § 33E case, the "substantial risk of a miscarriage of justice" standard is a harder burden for the defendant to satisfy. *Commonwealth* v. *Lennon,* 399 Mass. 443, 448-449 n.6 (1987), citing *Commonwealth* v. *Richmond,* 379 Mass. 557, 562 n.4 (1980).

justice if the evidence and the case as a whole, *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5 (1986), left us with a serious doubt that the defendants' guilt had been fairly adjudicated.[21] We have reviewed the evidence previously, see *Commonwealth* v. *Amirault*, 399 Mass. 617 (1987); *Commonwealth* v. *LeFave*, 407 Mass. 927 (1990), and, once again, our review of the evidence and of the proceedings at trial does not awaken doubts of sufficient magnitude to warrant upsetting the convictions and perhaps releasing these defendants permanently, as a retrial now would be very difficult. See *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21-22 (1986) (while not a bar, delay in raising the issue may be weighed against defendant if such delay has prejudiced the Commonwealth).

Although the defendants do not formally raise this point in their motions, both the statements of facts contained in their briefs and their oral arguments insist that these convictions were the product of nationwide hysteria in which charges of child sexual abuse rings were brought and often credited, sometimes in the most dubious circumstances. In some instances these charges have been recanted and convictions based on them have been subsequently overturned. See, e.g., *People* v. *Pitts*, 223 Cal. App. 3d 606 (1990). See also Ceci & Bruck, Jeopardy in the Courtroom: A Scientific Analysis of Children's Testimony (Amer. Psychol. Ass'n 1995); Ceci & Bruck, Suggestibility of the Child Witness: A Historical Review and Synthesis, 113 Psychol. Bull. 403 (1993). The most frequently cited vice in those cases has been the suggestion that details and accusations may have been planted in the accusing children's minds and mouths by investigators, poorly trained professionals, overzealous prosecutors, other children, and panicked parents who have themselves been the victims of such irresponsible suggestions. See, e.g., *State* v. *Michaels*, 136 N.J. 299 (1994). The defendants cite aspects of

---

[21]It is striking that this power is frequently used in respect to jury charges that include erroneous instructions as to the elements of a crime. See, e.g., *Commonwealth* v. *Thomas*, 401 Mass. 109, 119 (1987); *Commonwealth* v. *Pickles*, 393 Mass. 775, 778-780 (1985). This standard is well suited to these cases because, when the elements of a crime are incorrectly stated, there is a substantial risk that a person has been convicted for a course of conduct that is not criminal at all. This is not the case with respect to the type of omissions in issue here or in the case of evidence which might have been excluded had a proper objection been made. See, e.g., *Commonwealth* v. *Boyer*, 400 Mass. 52, 56-59 (1987).

the cases now before us that seem to conform to this type of communicated hysteria: The police advised parents to undertake their own investigations of possible abuse of their children, and were told some of the details of the abuse already reported by others. This obviously opened the door to parental suggestions of charges that might otherwise never have occurred to the children. It also might explain the similarities in some of the charges the children eventually made. Similarly, at trial, defense counsel argued that some interviews conducted by various officials and other individuals were suggestive and leading. We recognize that some of the children's statements included charges that were quite improbable.

All of this the defendants recount by way of background, no doubt in order to awaken serious doubts about the substantive propriety of these verdicts. We do not hesitate to condemn such practices as took place, but we still are not brought to the conclusion the defendants would wish. The gravamen of these complaints is that the child accusers' testimony was unreliable as the product of improper suggestion. But that complaint was fully aired at the two trials and was subject to our consideration at the time of Gerald Amirault's appeal. *Commonwealth* v. *Amirault,* 404 Mass. 221, 235-236 (1989). At that time we said:

> "The defendant argues that the testimony of the child victims was tainted by, or the product of, improper interviews conducted by the Department of Social Services, therapists, the police, and the prosecutor's office. The judge denied the defendant's motion [to dismiss].
>
> "There is ample evidence in this case that the children were interviewed by multiple persons — parents, social workers, attorneys, therapists, police officers, and other investigators. Despite the defendant's argument to the contrary, we think the judge was warranted in concluding that the children's ability to relate, recall, and recount their experiences independently was not so seriously undermined that their testimony should have been excluded."

*Id.* at 235.

Since we are now considering whether there is a substantial

risk of a miscarriage of justice we do not treat our prior consideration of the record as preclusive. But we reach the same conclusion. The children faced full cross-examination, testified under oath,[22] and were aware of the defendants' presence. Opportunities for face-to-face interaction took place periodically throughout the trial. The number of children testifying, the evidence of physical injury, and the parents' testimony regarding the bizarre, disturbed, and inappropriately sexualized behavior of their children, *Commonwealth* v. *LeFave*, 407 Mass. 927, 930 (1990); *Commonwealth* v. *Amirault, supra* at 225, and the extent to which these factors corroborated one another, combine to persuade us that the convictions do not raise a "substantial risk of a miscarriage of justice."

The dissent concludes that, even if there had been a waiver of the right to a face-to-face confrontation (which the dissent disputes), given the importance of face-to-face confrontation in assisting the jury in their evaluation of witness credibility, particularly the child witnesses, there was a substantial risk of a miscarriage of justice in its omission. The dissent quite correctly confronts us with the need to state more precisely the miscarriage of justice standard.

At the outset, we reject the argument that our strong reaffirmation of the right of confrontation is inconsistent with our conclusion that the waiver of this right did not create a sufficient risk of a miscarriage of justice to warrant new trials. If we accepted that reasoning, there could be no waiver of rights such as this. Moreover, it is a mistake to argue that because a trial protection designed to assist in reaching a reliable result is of constitutional dimensions, its omission must necessarily undermine the reliability of a guilty verdict to the extent that a new trial must be ordered. Of course, if a constitutional right has been preserved and there has been no waiver, then it can only be ignored if we are convinced that the error was harmless beyond a reasonable doubt. See *Commonwealth* v. *Curtis*, 417 Mass. 619, 635 (1994); *Commonwealth* v. *Owens*, 414 Mass. 595, 603 (1993). But it begs the question to speak of a constitutional violation here, because when a right has been effectively waived, there has been no constitutional viola-

---

[22]The children did not take the usual oath, but were instead asked to make a promise of truthfulness which was within the children's understanding. See *Commonwealth* v. *LeFave*, 407 Mass. 927, 942 (1990).

tion at all. *Commonwealth* v. *Repoza*, 400 Mass. 516, 520, cert. denied, 484 U.S. 935 (1987), quoting *Hankerson* v. *North Carolina*, 432 U.S. 233, 244 n.8 (1977) (noting "the normal and valid rule that failure to object . . . is a waiver of any claim of error"). What remains is the different question whether the result, in the light of the full record, leaves us or a motion judge with an abiding sense that a miscarriage of justice has occurred. *Commonwealth* v. *Fruchtman*, 418 Mass. 8, 19-20, cert. denied, 513 U.S. 951 (1994). *Commonwealth* v. *Gabbidon*, 398 Mass. 1, 5 (1986). It would be double counting to treat the omission of confrontation as creating that risk necessarily and on its own account. We must therefore consider more carefully what circumstances create the degree of risk warranting a new trial.

The most comprehensive and careful statement of the rule regarding the necessary conditions for establishing the existence of a substantial risk of a miscarriage of justice was stated by the Appeals Court in *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986):

> "The remaining exception [to the traditional rule that claims not raised at trial preclude their use on a motion for a new trial], that applied in *Commonwealth* v. *Freeman, supra,* has been at once the largest and most fluidly defined source of successful new trial motions seen in the Massachusetts courts in recent years. We think it is generally accepted that at least three elements are preconditions for the application of the *Freeman* exception: First, there must be a genuine question of guilt or innocence. Where evidence of guilt is strong and one-sided, it is generally concluded that no substantial risk exists of a miscarriage of justice.* See *Commonwealth* v. *Rembiszewski,* 391 Mass. at 134-135; *Commonwealth* v. *Hughes,* 380 Mass. 596, 601-602 (1980). Compare *Commonwealth* v. *Rossi,* 19 Mass. App. Ct. 257, 259-260 (1985). Second, the error must be sufficiently significant in the context of the trial to make plausible an inference that the result might have been otherwise but for the error. See *Gibson* v. *Commonwealth,* 377 Mass. 539, 543 (1979) ('one [defective] sentence in charge which occupies fifty-seven pages of transcript'). Compare *Commonwealth* v. *Shelley,* 374 Mass. 466, 470 (1978). Third,

it must be inferable from the record that counsel's failure to object was not simply a reasonable tactical decision. See, e.g., *Commonwealth* v. *Johnson,* 374 Mass. 453, 464-465 (1978)."

---

\* "For this reason the *Freeman* exception would generally not be available to a defendant prejudiced by the unobjected-to admission of highly incriminating evidence obtained in violation of Fourth Amendment protections."

As to the first factor, although there was sufficient evidence to support the juries' verdicts in both trials here, we would not characterize the evidence as overwhelmingly one-sided. And as to the third factor, counsel's failure to raise the confrontation issue at trial might have been a valid tactical decision. It is less likely to have been on appeal, although the Commonwealth's brief on direct appeal did bring the issue explicitly to the surface. See *supra* at 642 n.16. Therefore, at bottom, these cases ask, in terms of *Miranda*'s second factor, whether the lack of confrontation so jeopardized the proceedings that there is a substantial risk that the result would have been different had the children not been seated so that the defendants could only observe them in profile. It is up to the defendants to show that, but for the lack of face-to-face confrontation, there is a substantial risk that the outcome of the trials would have been different. This burden is a heavy one.

Once a defendant has waived his right to face-to-face confrontation, this right drops out as a constitutional absolute.[23] The defendant then must show that, taking the proceedings as a whole, the purpose and value of confronta-

---

[23]The right to face-to-face confrontation is not unwaivable. Nor would we want to add this right to the very short list of rights, see, e.g., *Commonwealth* v. *Pavao,* 423 Mass. 798, 802 (1996) (waiver of jury trial must be knowing and voluntary and come "directly from the defendant"); *Commonwealth* v. *Fernandes,* 390 Mass. 714, 715-718 (1984) (guilty plea must be voluntarily tendered by defendant aware of circumstances), that must be waived personally by a defendant and cannot be waived by his counsel. However important this right of face-to-face confrontation, it is no more so than many others as to which no such rule obtains. The proliferation of such personal waiver requirements would lead a judge to intrude on the

tion have not been sufficiently served and that as a result there is a substantial risk that the outcome of the trial would have been different. A mere possibility of a different outcome will not satisfy this burden. After all, the formula asks if there is a *substantial* risk of a miscarriage of justice. As has been said in the analogous area of ineffective assistance of counsel,[24] that "[i]t is not enough for the defendant to show that [counsel's] errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test . . . and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding" (citation omitted). *Strickland* v. *Washington*, 466 U.S. 668, 693 (1984). Accordingly, we look to the trial as a whole to determine whether the value of confrontation was sufficiently secured by alternative means. Thus at this stage, when there has been a waiver and we consider the matter on a motion for a new trial, our inquiry resembles that in *Maryland* v. *Craig*, 497 U.S. 836, 845-846 (1990).

"The central concern of the Confrontation Clause is

defense presentation in a manner that would jeopardize the primary responsibility our system places on counsel.

[24]We have compared the "substantial risk of a miscarriage of justice" standard to the standard for ineffective assistance of counsel. *Commonwealth* v. *Curtis*, 417 Mass. 619, 624 n.4 (1994). It is possible that we are somewhat readier to find ineffective assistance of counsel, at least before the regular processes of appeal have run their course, than has been the Federal practice under *Strickland* v. *Washington*, 466 U.S. 668 (1984), although our two leading cases do not articulate a noticeably different standard. See *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 (1977) ("there ought to be some showing that better work might have accomplished something material for the defense"); *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974) ("discerning examination and appraisal . . . whether there has been serious incompetency, inefficiency, or inattention of counsel . . . and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence"). It is noteworthy how rarely we grant claims based on alleged ineffective assistance of counsel, further supporting our determination that this is an extraordinary power and new trials based on a substantial risk of a miscarriage of justice should be sparingly granted. In this we appear to have heeded the warning in *Saferian*, to avoid a standard by which "judgments would be under constant attack, and judges 'would become Penelopes, forever engaged in unravelling the webs they wove.' " *Id.* at 99, quoting L. Hand, J., in *Jorgensen* v. *York Ice Mach. Corp.*, 160 F.2d 432, 435 (2d Cir.), cert. denied, 332 U.S. 764 (1947).

to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact . . . . The combined effect of these elements of confrontation — physical presence, oath, cross-examination, and observation of demeanor by the trier of fact — serves the purposes of the Confrontation Clause by ensuring that evidence admitted against an accused is reliable and subject to the rigorous adversarial testing that is the norm of Anglo-American criminal proceedings."

As we have already observed, all of the child witnesses in the two trials testified in the physical presence of the defendants, testified under oath, were subject to cross-examination, and sat in front of the jury who could observe their demeanor and assess the weight and credibility of their testimonies. Moreover, there were several actual face-to-face encounters with the child witnesses throughout the trial. See *supra* at 622, 626-627. We conclude that in these circumstances, the defendants have not met their burden of showing there was a substantial risk of a miscarriage of justice.

On these grounds, we affirm the motion judge's denial of Gerald Amirault's motion for a new trial, vacate the order allowing the motion of Violet Amirault and Cheryl Amirault LeFave for a new trial, and order the reinstatement of the original convictions of Violet Amirault and Cheryl Amirault LeFave.

*So ordered.*

O'CONNOR, J. (dissenting). In determining whether a defendant's claim of a constitutional violation at trial has been waived, the court "must determine whether the constitutional theory upon which the petitioner now relies is a theory which was sufficiently developed at the time of the petitioner's trial and appeal to afford the petitioner a genuine opportunity to raise his claim" (footnote omitted). *DeJoinville* v. *Commonwealth*, 381 Mass. 246, 248 (1980). The court "do[es] not require that defense counsel foresee developments in the case law." *Commonwealth* v. *Garcia*, 379 Mass. 422,

439-440 (1980). A "defendant should not be penalized where his failure to object was due to a lack of guidance in the case law regarding an evolving constitutional standard." *Commonwealth* v. *White*, 392 Mass. 282, 286 (1984). A defendant who fails to raise a constitutional claim does not waive that claim merely because previously decided cases "provide[d] some guidance on the issue." *DeJoinville* v. *Commonwealth*, *supra* at 251.

Because, in *Commonwealth* v. *Johnson*, 417 Mass. 498, 503 (1994), this court for the first time construed art. 12 as giving a criminal defendant the right to confront witnesses face-to-face "in such a way that the witness must either look upon the accused's face as he testifies or deliberately avert his eyes and look away from him," *ante* at 630, it cannot fairly be said that, when the present cases were tried and argued on appeal, before *Johnson* was decided, the defendants were on fair notice of the relevant extent of their art. 12 rights and therefore, by not invoking them, they waived them. Before *Johnson* was decided, there had been no foreshadowing of its holding. It was not so predictable as to have given the defendants a genuine opportunity to raise the claim that they had been denied "face-to-face" confrontation as required by art. 12 — as construed by this court in *Johnson*. See *Commonwealth* v. *Rembiszewski*, 391 Mass. 123, 127-128 (1984); *Commonwealth* v. *Repoza*, 400 Mass. 516, 520, cert. denied, 484 U.S. 935 (1987) ("we have determined that we would not require lawyers to be clairvoyant and to object to instructions not yet identified as constitutional error").

In support of its conclusion that the defendants waived their art. 12 right to confront witnesses against them "in such a way that the witness must either look upon the accused's face as he testifies or deliberately avert his eyes and look away from him," the court, *ante* at 628, refers to the statement in *Commonwealth* v. *Gallo*, 275 Mass. 320, 333 (1931), quoted in *Commonwealth* v. *Bergstrom*, 402 Mass. 534, 544 (1988), that the "purpose [of art. 12] was to put beyond the possibility of alteration except by the people themselves the principle already established as a part of the common law *that the witness should confront the accused face to face*" (emphasis in *Bergstrom*). In *Gallo*, the question was whether, at the defendant's second trial, a new trial having been granted to him, a transcript of the testimony of a Com-

monwealth witness, who had testified at the first trial and had been cross-examined, but was unavailable at the second trial, could be read to the jury without violating the defendant's art. 12 rights. In resolving that issue in the Commonwealth's favor, the court did not expressly or impliedly intimate that the art. 12 right of confrontation included a right of the defendant to be so positioned in reference to the witnesses against him that "the witness must either look upon the accused's face as he testifies or deliberately avert his eyes and look away from him."

In connection with the question whether the defendants either at trial or on their earlier appeals waived the art. 12 argument they now make, the court relies primarily on *Commonwealth* v. *Bergstrom, supra,* and *Coy* v. *Iowa,* 487 U.S. 1012 (1988), concluding that "the generalities in *Bergstrom* and even more so the statement of the law in *Coy* were sufficient to put the defendants on notice that the objection they raise now presented a live issue [at the time of their appeals] and it required no clairvoyance to read it there." *Ante* at 644. I disagree. In *Bergstrom,* the court considered the constitutionality of an earlier version of G. L. c. 278, § 16D, which permitted the presentation to the jury of videotaped testimony of witnesses taken outside the presence of the defendant and the jury. The court held that under art. 12 the accused has the right to be present when the accusers testify. The court correctly distinguishes the issue here from that presented in *Bergstrom,* observing that "[i]n the cases before us, however, that issue is not presented as the child witnesses and the accused were, with [one] exception . . . present together in the court room when the witness gave his testimony." *Ante* at 629. The court's interpretation of art. 12 in *Bergstrom* was clear and narrow. "The plain meaning of assuring a defendant the right 'to meet the witnesses against him face to face' is that the accused shall not be tried without the presence, in a court of law, of both himself and the witnesses testifying against him." *Id.* at 542. There was nothing in *Bergstrom* that fairly could be said to have notified the defendants that the seating arrangement at their trials was defective under art. 12. On the contrary, the court concluded its decision in *Bergstrom* by emphasizing the continuing need for trial judges to take steps to accommodate child witnesses during trials such as the defendants':

"The courts too have recognized, and should continue to recognize, that traditional formalities of trials are not necessarily an integral part of protected constitutional rights. Our conclusion today should not be taken to preclude the use of methods by . . . trial judges designed to minimize the stress and trauma which may be imposed on victims and witnesses in cases such as the one at bar. Both before and during trial, measures can be taken to reduce the adverse impact of giving testimony. By way of example, a judge may require that the environment in which a witness is to give testimony be made less formal and intimidating . . . ." *Id.* at 553.

*Bergstrom*'s narrow interpretation of art. 12, coupled with its explicit encouragement of trial judges to continue to modify court room arrangements and trial procedures to accommodate child witnesses in child abuse cases, cannot reasonably have put the defendants on notice of the constitutional infirmity of their trials — the denial of face-to-face confrontation "in such a way that the witness must either look upon the accused's face as he testifies or deliberately avert his eyes and look away from him," *ante* at 630, as contemplated by *Commonwealth* v. *Johnson, supra.*

In *Coy* v. *Iowa, supra,* the United States Supreme Court, relying on the Sixth Amendment to the United States Constitution, struck down a statute that permitted witnesses to testify in the court room from behind a screen, which made it impossible for the witness to see the defendant and allowed the defendant only a dim view of the witness. That situation was quite different from the arrangement considered in *Commonwealth* v. *Johnson, supra,* where the defendant and witnesses were able to see each other clearly but without a literal face-to-face confrontation. There is no suggestion in the Supreme Court's opinion in *Coy* that, in the future, the Court was likely to take the step with respect to the Sixth Amendment that the Supreme Judicial Court later took in *Johnson* with respect to art. 12. Indeed, two years after *Coy* was decided, the concurring and dissenting Justices in *Coy* formed the majority in *Maryland* v. *Craig,* 497 U.S. 836 (1990), in which the Court upheld a statute permitting a child witness in a child abuse case to testify outside the defendant's physical presence by one-way closed circuit television. *Id.* at 857. The Court in *Craig* concluded that face-to-face confrontation

between the defendant and the witnesses against him was not "an indispensable element of the Sixth Amendment's guarantee of the right to confront one's accusers," *id.* at 849-850, and that the right to a physical, face-to-face confrontation can be denied where "necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." *Id.* at 850.

The defendants' claims, of course, are not premised on the Sixth Amendment, as were the claims in *Coy.* The defendants do not rely on the Sixth Amendment; rather, they argue that their rights to face-to-face confrontation between themselves and the child witnesses under art. 12, as interpreted by this court in *Commonwealth* v. *Johnson, supra,* were violated. In my view, the art. 12 theory announced for the first time in *Johnson* and now relied on by the defendants was not sufficiently developed at the time of the defendants' trials and appeals to have afforded them a genuine opportunity to raise their claims. See *DeJoinville* v. *Commonwealth,* 381 Mass. 246, 248 (1980).

My conclusion is that the rule announced in *Commonwealth* v. *Johnson, supra,* was not so predictable when these cases were tried or when they were argued on appeal that the defendants' failure to challenge previously the court room seating arrangements under art. 12 should preclude them from doing so now. *Commonwealth* v. *Rembiszewski,* 391 Mass. 123, 128 (1984). To bar the defendants' art. 12 claim because of their failure to raise the claim at their trials or on direct appeal is "tantamount to requiring clairvoyance on the part of defense counsel," *Commonwealth* v. *Stokes,* 374 Mass. 583, 588 (1978), and departs from our tradition of "not requir[ing] that defense counsel foresee developments in the case law." *Commonwealth* v. *Garcia,* 379 Mass. 422, 439-440 (1980).

"When we excuse a defendant's failure to raise a constitutional issue at trial or on direct appeal, we consider the issue 'as if it were here for review in the regular course.' *Commonwealth* v. *Kater,* 388 Mass. 519, 533 (1983). If constitutional error has occurred, we reverse the conviction unless the error was harmless beyond a reasonable doubt. *DeJoinville* v. *Commonwealth, supra* at 254. *Commonwealth* v. *Garcia,* 379 Mass. 422, 442 (1980). *Connolly* v. *Commonwealth,* [377 Mass. 527, 538 (1979)]." *Commonwealth* v. *Rembisze-*

*wski, supra* at 126. *Commonwealth* v. *Johnson, supra* at 505 n.6.

The defendants have not waived their arguments based on art. 12 as construed by the court in *Commonwealth* v. *Johnson, supra,* and constitutional error has occurred in the defendants' trials. I, too,

> "have no doubt that the seating arrangements in these cases violated the confrontation rights of the accused under art. 12. . . . The witness must give his testimony to the accused's face, and that did not happen here. . . . The witness who faces the accused and yet does not look him in the eye when he accuses him may thereby cast doubt on the truth of the accusation. See . . . *Commonwealth* v. *Kater,* 409 Mass. 433, 446 (1991). The child witnesses in these cases did not testify to the face of the accused. Though they were aware of the presence of the accused, the arrangement was such — and deliberately so — that they could testify quite comfortably and naturally without ever having the accused in their field of vision." *Ante* at 632.

Because I am not convinced beyond a reasonable doubt that the error in either trial was harmless, that is, that the constitutionally deficient seating arrangements at the defendants' trials did not contribute to the guilty verdicts, I would vacate the order denying Gerald Amirault's motion for a new trial and I would order a new trial in that case. I would affirm the order granting a new trial to Violet Amirault and Cheryl Amirault LeFave.

If, contrary to fact, I were satisfied that the defendants waived their art. 12 and *Commonwealth* v. *Johnson* arguments by not presenting them sooner, the appropriate question would be whether the absence of face-to-face confrontation of the nature required by *Johnson* resulted in a "substantial risk of a miscarriage of justice." *Commonwealth* v. *Martinez,* 420 Mass. 622, 624 (1995). *Commonwealth* v. *Daigle,* 379 Mass. 541, 549 (1980). *Commonwealth* v. *Freeman,* 352 Mass. 556, 563-564 (1967). I would answer that question, "Yes, the absence of face-to-face confrontation in the manner contemplated by *Johnson* did result in a substantial risk of a miscarriage of justice."

Following the Appeals Court's analysis in *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986), the court considers, as shall I, the following three preconditions for establishing such a risk. First, the evidence of guilt must not be "strong and one-sided." *Id.* Second, "the error must be sufficiently significant in the context of the trial to make plausible an inference that the result might have been otherwise but for the error." *Id.* And third, the record must permit the inference that counsel's failure to object was not simply a "reasonable tactical decision." *Id.* I conclude that each of these conditions is satisfied, so, in my view, there is a substantial risk of a miscarriage of justice in these cases requiring new trials.

With respect to the first consideration, the court acknowledges that the evidence in the trials was not "overwhelmingly one-sided," *ante* at 651, and, with respect to the third condition, the court appears to concede that the record permits an inference that counsel's failure to object was not simply a "reasonable tactical decision." Surely, the proper inquiry relative to the third precondition is not whether "counsel's failure to raise the confrontation issue at trial might have been a valid tactical decision." *Ante* at 651. The third precondition is that the opposite inference was permissible from the record, as it surely was — which the court does not appear to contest. I shall turn, then, to the remaining precondition, the second one, which is that "the error must be sufficiently significant in the context of the trial to make plausible an inference that the result might have been otherwise but for the error."

I recognize that in particular cases an error, even an error of constitutional magnitude, may not be "sufficiently significant in the context of the trial to make plausible an inference that the result might have been otherwise but for the error." It is quite clear, however, that these are not such cases. In *Commonwealth* v. *Johnson, supra* at 503, the court discussed the importance of the positioning of the witness and the defendant in a way that requires the witness to look toward the defendant's face as he faces him or deliberately avoid doing so. The court observed:

> "If a witness is sitting face to face with a defendant but refuses to make eye contact, jurors observing this likely will take it into consideration when assessing credibility . . . . On the other hand, when the witness is permitted

to testify with his back to the defendant, the jury are unable to observe the effect of face-to-face confrontation on the witness." (Citations omitted.) *Id.*

Yet, the child witnesses in these cases "could testify quite comfortably and naturally without ever having the accused in their field of vision." *Ante* at 632. The court recognizes that "[t]he Commonwealth's cases consisted primarily of the testimony of nine children . . . ." *Ante* at 621. In allowing Violet Amirault and Cheryl Amirault LeFave's motion for a new trial, the motion judge made the same observation: "The Commonwealth's entire case depended upon the credibility and reliability of the children witnesses. The testimony of the children was the critical evidence in the case and the verdict was based on the jury believing that testimony."

In these cases, where the Commonwealth presented no scientific or physical evidence linking the defendants to the crimes, and where the jury's verdicts were based on their assessment of the child witnesses' credibility, the absence of *Johnson*-style face-to-face confrontation was surely "sufficiently significant in the context of the trial[s] to *make plausible* an inference that the result *might* have been otherwise but for the error" (emphasis supplied). *Commonwealth* v. *Miranda, supra* at 21. In both cases, a substantial risk of a miscarriage of justice has been established. Our desire for finality should not eclipse our concern that in our courts justice not miscarry.

I would vacate the denial of Gerald Amirault's motion for a new trial and order a new trial as to him. I would affirm the order granting a new trial to Violet Amirault and Cheryl Amirault LeFave.