Lowy, David A., J.
In 1999, the defendant, James Kartell, was indicted for first-degree murder after fatally shooting his wife’s lover twice during a fight between the two men at the hospital bedside of the defendant’s wife, Suzan Kamm. The defendant contends that he acted in self-defense. In 2000, after a trial,[1] the jury convicted the defendant of voluntary manslaughter. On direct appeal, that judgment was affirmed. Commonwealth v. Kartell, 58 Mass.App.Ct. 428, rev. denied, 440 Mass. 1102 (2003).
The defendant now moves for a new trial on several grounds. First, the defendant asserts that the admission of hearsay statements made by Kamm to a hospital employee and police officer, where Kamm was unavailable to testify at trial, violated his state and federal constitutional rights to confront witnesses under the Supreme Court’s ruling in Crawford v. Washington, 541 U.S. 36, 68 (2004).[2] The defendant’s remaining arguments in support of his motion relate to three alleged errors in his trial which he raised on direct appeal, but now reframes as violations of his federal constitutional rights. I have conducted three hearings on the motion, the final one to receive arguments in the aftermath of the Supreme Judicial Court’s interpretation of Crawford in Commonwealth v. Gonsalves, 445 Mass. 1 (2005). After an examination of the transcripts from the trial and pre-trial motions as well as consideration of the arguments and materials presented at the hearings on the motion for new trial, the Court denies the defendant’s motion.
BACKGROUND
In 1998, Kamm, who had been married for thirty-three years to the defendant, became romantically involved with Janos Vajda and moved in with him. The defendant became depressed as his reconciliation efforts failed. In mid-December of 1998, the defendant learned that Kamm had contracted herpes and told friends that he wanted to sue Vajda. Kamm had, at that point, considered returning to the defendant, but when she told the defendant that she had changed her mind, the defendant became so distraught that he thought of using his gun on himself and on Vajda. In Januaiy of 1999, while at a supermarket, the defendant discussed with an acquaintance Kamm’s relationship with Vajda. The defendant, appearing extremely unhappy, told the acquaintance that he could kill Vajda. In mid-Februaiy 1999, Kamm asked the defendant for a divorce.
In late February of 1999, Kamm was hospitalized at Holy Family Hospital in Methuen, suffering from pneumonia. At approximately 6:15 p.m., Kamm was being examined by Dr. Davor Kvatemik, who found Kamm to be fatigued and febrile. Vajda was visiting Kamm at that time. The defendant arrived and told Vajda to leave. Kamm told the defendant that if he did not act in a civilized way, she would call the police and obtain a restraining order. At approximately 6:30 p.m., Dr. Kvaternik completed his examination and left the room. The defendant again asked Vajda to leave. When Vajda did not, he pushed Vajda and threw Vajda’s jacket towards the door. Vajda returned the push, and the two men began to hit each other. Kamm screamed for them to stop. At one point, Vajda struck the defendant in the back of his head, and when the defendant turned around, Vajda hit him in the face dislodging his glasses.[3]
What transpired next was the subject of testimony at trial by several witnesses. The defendant testified that Vajda continued to punch and kick him all over his body and that he was terrified that Vajda was going to kill him. The defendant was able to reach into his pocket, remove his gun and point it at Vajda, who struggled for it and pulled the defendant close to him. The defendant, without saying a word, pulled the trigger, firing a shot into Vajda’s abdomen. (Tr. Vol. 10, p. 62.) The defendant testified that Vajda then grabbed him, threw him to the area of the floor between the bed and the window, pounced on top of him, then banged the defendant’s head on the floor and the legs of a chair. (Tr. Vol. 10, p. 64-65.) The defendant testified that somehow he was able to free his right arm and fire the gun a second time without knowing where the bullet went, and that Vajda then ceased his assault. (Tr. Vol. 10, p. 68.) At that point, the defendant unloaded the gun, put it on the bed tray table, and tried to hug Kamm, who told him to get out and said, “Don’t touch me. You killed him.” (Tr. Vol. 10, p. 70.) The defendant walked into the corridor and stood outside a room near Kamm’s.
Several hospital employees also testified. Michael Cook, a unit support aide who was in the hallway about ten to fifteen feet from Kamm’s room, first heard sounds like furniture being moved coming from Kamm’s room and a woman screaming “Stop it.” Cook went to the doorway of Kamm’s room, looked inside and saw Vajda and the defendant standing, facing each other and fighting. Cook glanced away for a second, and when he looked back into the room, the defendant was kneeling on the floor on his left knee, and Vajda, standing about two feet to the defendant’s left, punched the defendant in the forehead and tried to kick the defendant.[4] Cook watched Vajda back up with his hands raised, and then saw the defendant reach to his hip and remove a gun, saying, “Now you’re going to get it” or “Now you’ve done it.” (Tr. Vol. 6, pp. 37-38.) Cook ran out of the room for help, yelling that the man had a gun, and when he got about 10 feet away, he heard a gunshot. He continued to run around the *136 corner to the nurses’ station, but before reaching it he heard a second gunshot within two to ten seconds of the first gunshot. (Tr. Vol. 6, pp. 40 and 55.)
A charge nurse, Donna McCarthy, also heard a man in Kamm’s room angrily say, “Now you’re going to get it.” While approaching Kamm’s room, McCarthy heard a gunshot and, within what she estimated to be two or three more seconds, a second gunshot. She ran to the nurses’ station to call for assistance.
Dr. Kvaternik, who had left Kamm’s room only three minutes earlier, was at the nurses’ station when he heard the commotion coming from Kamm’s room. He ran toward the sounds and as he neared Kamm’s room he heard a gunshot. He continued into the room and stood about three or four feet away from the defendant and Vajda for about ten seconds. (Tr. Vol. 6A, pp. 30-31.) In that brief period he saw Vajda motionless on his knees with his head against the floor and his feet entwined with the defendant’s feet. (Tr. Vol. 6A, pp. 28-29, 31.) According to Dr. Kvaternik, the defendant was “at the other side of Mr. Vajda” and holding a gun against or within two inches of the back of Vajda’s head. (Tr. Vol. 6A, p. 30-32.) In response to a question about what type of movement he saw the defendant make, Dr. Kvaternik testified that “(t]he only motion I sawagain, we’re talking about ten seconds hereis Dr. Kartell, the hand . . . being pointed with the gun to his skull in a brief, brief fraction of the time before the shot came out.” (Tr. Vol. 6A, p. 33.) At about the same time as Dr. Kvaternik saw the shot being fired, Michael Bryant, a patient care associate, pushed Dr. Kvaternik toward the vestibule of the room. (Tr. Vol. 6A, p. 32.) Dr. Kvaternik then called out in the hallway for assistance and returned to Kamm’s room, where Kamm was crying and yelling at the defendant, “You killed him.” Dr. Kvaternik commenced CPR on Vajda, but stopped after about thirty seconds, when a nurse offered to take over after she called the doctor’s attention to the blood all over his hands. (Tr. Vol. 6A, p. 38.) While Dr. Kvaternik had been performing CPR, the defendant left the room.
Michael Bryant entered Kamm’s room at about the same time Dr. Kvaternik arrived. Bryant stood near the edge of Kamm’s bed for two to five seconds and saw the defendant holding a gun to the back of Vajda’s head, while both Vajda and the defendant were on their knees. Bryant saw Vajda moving his hands on a bedside table, and saw the defendant’s finger move on the trigger and heard a click, but the gun did not discharge. Bryant then pushed Dr. Kvaternik towards the door to leave the room, but both Bryant and Dr. Kvaternik were in the vestibule when Bryant heard a gunshot.
When the fight was underway, a patient care associate, Carole Brown, was assisting a patient in a nearby room. She heard a loud sound and a woman say, “No. Stop it. Stop.” Brown walked toward the sounds and from the vestibule of Kamm’s room she saw the defendant and Vajda fighting on the floor in the three-foot area between the bed and the window. Vaj da was standing over the defendant, who was lying on his side on the floor. In a three-to five-second period, Brown saw Vajda hit the defendant five or six times in the area of his armand shoulder. Brown yelled at them to stop and left to ask someone to call security. Brown then heard a gunshot and started closing patients’doors. Brown waited inside anearbyroomfor about two seconds, then returned to the corridor.
Shortly thereafter, once Brown saw the defendant being pushed up against the wall of the corridor by security guards, she walked to the doorway of Kamm’s room, where she observed Kamm sitting in bed in a hysterical state, screaming, crying, and shaking. Dr. Kvaternik was on the opposite side of the bed, next to the window, treating Vajda.
Another nurse, Kristina Collins, also went to Kamm’s room after hearing the bangs and seeing the defendant being pushed against a corridor wall by a security guard. Collins saw Kamm sitting in the bed, screaming loudly, with her knees up almost in a fetal position and her hands covering her ears, while Dr. Kvaternik treated Vajda.
Dr. Kvaternik testified that while he was performing CPR on Vajda but after the defendant had left the room, he had instructed staff to remove Kamm from the room and to give her oxygen “because she had a type of pneumonia and oxygen was needed, we needed oxygen to keep abetter concentration level, competent for her well-being.” (Tr. Vol. 6A, p. 39.) Nothing in the trial transcript, however, shows that Kamm ever received the oxygen ordered by Dr. Kvaternik. Brown helped Kamm up from the bed and out of the room, along with her IV pole and her medication. It was a difficult process, Brown testified, because Kamm “was so rigid and screaming and frightened and the IV pole was caught on something. And I was trying to sort of keep her from seeing.” (Tr. Vol. 8, p. 190.) Brown was holding and supporting Kamm, who had difficulty walking and was shaking tremendously, screaming and crying. Brown led Kamm to the solarium and put her on a couch. Although Brown asked Kamm no questions, Kamm was speaking in a faint voice because she was weak from being sick, and was sobbing at the same time.
At trial, Brown testified over the defendant’s objections as to Kamm’s statements to her, which were admitted under the spontaneous utterance[5] exception to the rule against hearsay. According to Brown, Kamm told her as they walked into the solarium that the defendant “just kept pushing at [Vajda], hitting him and hitting him up the side of his head and provoking him and hitting him on his shoulder and he wouldn’t leave him alone . . . And [Vajda] was just sitting there.” Brown testified that she was trying to *137 calm Kamm down in the solarium because “her respirations were really bad at the time.” (Tr. Vol. 8 p. 194.) There, Brown said that Kamm repeated again and again that the defendant had been provoking Vajda, that the defendant wouldn’t stop picking on Vajda, and that the defendant was hitting Vajda on the side of his head. Brown testified that Kamm then said to her, “And he had that gun in his pocket and it was a loaded gun in his pocket. . . [The defendant] usually carries it on his leg in a holster .. . But this time, he had it in his pocket and it was loaded.” Brown testified that Kamm’s respirations were worsening to the point where she couldn’t breathe, and Brown told Kamm to try to calm down. (Tr. Vol. 8 p. 195.) Brown further testified that Kamm made the following statements to her in the solarium:
A. “And after Dr. Kvaternik had left the room, . . . Jim threw Janos’s coat out into the corridor and kept provoking him and he just wouldn’t stop . . . And I told Jim, ‘Let’s all just sit down and talk about this ... If you don’t stop it, Jim, . . . I’m going to get a restraining order against you so that you can’t come visit me here at the hospital.’ ”
“She said that, how, after he was provoking him, she said to me that they started fighting. They were fighting and that they were on the other side of the room. She was screaming at them to stop. She said, ‘Stop the fighting. Please, just stop.’ And she said that Jim and Janos were on the other side of the bed near the window and they were fighting and she said . . . Jim was sort of on his back, sort of on his back with Janos over him.”
Q. “Do you recall Suzan Kamm saying that she saw Kartell holding Vajda’s head in his arms?”
A. “Yes.”
Q. “Do you recall her saying that Kartell said, ‘Look at him now,’ and he shot him in the head?”
A. “Yes.”
Q. “Do you recall Suzan Kamm saying that after Kartell shot Janos in the back of the head, Kartell stood up, unloaded his gun, put it on the table and went to tiy to hug you [?]. ‘I told him, ‘Get away, you just killed Janos.’ ”
A. “Right.”
At 6:43 p.m., several Methuen police officers received a dispatch call to go to the hospital on a report of gunshots. Within three minutes, Officers Edward Guy and Todd Himmer arrived at the fourth floor of the hospital, where they saw the defendant standing with security personnel. Guy went to the doorway of Kamm’s hospital room, from which position he saw “a lot of blood” and numerous medical workers near Vajda. Himmer first spoke with the defendant for four or five minutes and asked him what had happened. Himmer then walked two doors down to the solarium to speak with Kamm.
Himmer entered the solarium and did not immediately approach Kamm, who was on a couch conversing with hospital personnel, and shaking, crying, and coughing “almost to the point where she vomited.” Within two minutes, however, Himmer introduced himself to Kamm, and over the course of ten or fifteen minutes, Kamm told Himmer what she recalled. At trial and over the defendant’s objections, Kamm’s statements to Himmer were admitted as spontaneous utterances. Himmer testified on direct examination as follows:
Q. “What did she say to you concerning how this thing, event started?”
A. “She stated to me that she was in that room. Janos went in to visit her. She was being examined by Dr. Kvaternik, when Jim came in. He grabbed Janos’s jacket, threw it out in the hall and ordered Janos to leave the room."
Q. “Did she tell you at that time, what happened after the defendant ordered Janos out of the room?”
A. “Yes, she said Jim pushed Janos. They began to push each other back and forth. Then they began to fight.”
Q. “Did she indicate to you what she did at that time, when she observed this fight?”
A. “She said she started screaming for the security.”
Q. “Did she indicate where this fight was taking place in the room?”
A. “She said it was, they were on the floor between her floor and the bed.”
Q. “After this, shortly after this fight started, what did she say she saw the defendant do?”
A. “She saw Jim pull a handgun.”
Q. “And what did she say after that?”
A. “She said there was a struggle for the handgun and that Jim got on top."
Q. “And what did she see or hear next?”
A. “She heard a noise and she remembered smelling smoke.”
Q. “Did she indicate to you where Janos and the defendant were at that time, what position they were in?”
A. “She said that Jim had Janos’s head cradled in his arm.”
Q. “And what happened next?”
A. “He had the gun pointed to the back of his head and he stated, ‘Now I’m going to get you.’ And then he fired the gun.”
Q. “After he fired the gun in the back of Janos’s head, what did she say he did then?”
*138 A. “He got up, placed the weapon on the table, unloaded.”
(Tr. Vol. 9, p. 7.)
Several physicians, nurses, and aides responding to Kamm’s room first found that Vajda was not breathing but had some heart activity. Shortly before 7 p.m., however, they ceased their efforts in the absence of any signs of life. An autopsy confirmed that Vajda had suffered two mortal gunshot wounds, the first to his left upper abdomen and the second to the back of his head.
An emergency room physician, Dr. Edward O’Neil, was directed to take care of the defendant, who was still out in the hallway near Kamm’s room. Dr. O’Neil and the defendant arrived in the emergency room at 7:10 p.m. There it was determined that the defendant had no life-threatening injuries, but had swelling and bruises on his body and most of his face, six contusions on his head, and a superficial 3-centimeter laceration beneath his left eye.
At trial, Kamm asserted the marital privilege under G.L.c. 233, §20, and declined to testify. She was not available to the defense at any time for cross-examination. The key issue presented at trial was whether the defendant acted in self-defense.
The Commonwealth introduced in evidence the defendant’s .38 caliber Smith and Wesson handgun along with two spent cartridges of ammunition and three unspent cartridges, all of which the defendant had placed on the bedside tray table next to Kamm immediately after the shooting. The Commonwealth also introduced in evidence the pants worn by the defendant at the time of the shooting. Those pants had a small interior pocket containing six live rounds of ammunition.
DISCUSSION
Upon the filing of a motion for new trial, the Court may grant relief at any time if it appears that justice may not have been done. Mass.R.Crim.P. 30(b). Although the Court considers all claims on a new trial motion, waived or not, a different standard of review applies to unpreserved claims. See Commonwealth v. Randolph, 438 Mass. 290, 293-94 (2002). With respect to errors of a constitutional dimension, when the constitutional theory on which the defendant has relied was not sufficiently developed at the time of trial or direct appeal to afford the defendant a genuine opportunity to raise his claim at those junctures of the case, the Court reviews the claim as if it had been properly preserved. Id. at 295. Where a defendant has failed to preserve his claim for review, the Court must nonetheless grant relief when it is uncertain that the defendant’s guilt has been fairly adjudicated. Id. at 294-95.
1. Crawford Issue
A. The Admissibility of Kamm’s Statements to Himmer and Brown
The defendant claims that the admission of Kamm’s statements through Brown and Himmer violated his right to confrontation under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[6] Specifically, the defendant asserts that the admission of these statements deprived him of the opportunity to confront an adverse witness, Kamm, and that this evidence might have affected the jury’s evaluation of a critical issue at trial: the reasonableness and spontaneity of the defendant’s actions. The defendant relies upon Crawford v. Washington, 541 U.S. 36 (2004), which, as explained below, announced a new evidentiary rule after the defendant’s conviction became final. In Crawford, the Court held that the Sixth Amendment right to confrontation:
imposes a complete bar to the admission of out-of-court statements that are determined to be testimonial unless (1) the declarant is available at trial or (2) the declarant is formally unavailable to testify and the defendant had a prior opportuniiy to cross-examine the declarant. With certain historic exceptions, all other out-of-court testimonial statements are barred, regardless of whether they possess any indicia of reliability . . . The admissibility of non-testimonial out-of-court statements remains governed largely by State hearsay rules.
Commonwealth v. Gonsalves, 445 Mass. at 9, citing Crawford v. Washington, 541 U.S. at 61, 68.
The Court in Crawford declined to give a detailed definition of testimonial statements, but explained that, at a minimum, statements procured through “police interrogations” are per se testimonial. See Crawford, 541 U.S. at 68.[7] The Supreme Court has supplied no clear definition of “police interrogations” other than to instruct that the term should be understood in its colloquial rather than technical legal sense. Id. at 53 n.4.[8]
The Supreme Judicial Court, in applying Crawford’s ambiguous guidance, developed a doctrinal dichotomy between statements which are per se testimonial and those which are testimonial in fact. See Commonwealth v. Gonsalves, 445 Mass. at 13. First, the Supreme Judicial Court explained that “interrogation must be understood expansively to mean all law enforcement questioning related to the investigation and prosecution of a crime.” Commonwealth v. Gonsalves, 445 Mass. at 8. The Gonsalves court concluded that interrogation for purposes of Crawford means “questioning by law enforcement agents, whether police, prosecutors, or others acting directly on their behalf, other than to secure a volatile scene or to establish the need for or provide medical care, is interrogation in the colloquial sense” and includes investigatory interrogation, such as preliminary fact *139 gathering and assessment as to whether a crime has taken place. Commonwealth v. Gonsalves, 445 Mass. at 9.
The Gonsalves Court categorized as per se testimonial statements those which are:
part of an affidavit, deposition, confession, or prior testimony at a preliminary hearing, before a grand jury, or at a former trial, or [statements] procured through law enforcement interrogation (which does not include emergency questioning by law enforcement to secure a volatile scene or determine the need for or provide medical care).
Commonwealth v. Gonsalves, 445 Mass. at 13.
In contrast to per se testimonial statements, “[s]tatements made in response to emergency questioning by law enforcement to secure a volatile scene or determine the need for or provide medical care are not per se testimonial,” nor are “out-of-court statements made in response to questions from people who are not law enforcement agents, and statements offered spontaneously, without prompting, regardless of who heard them.” Id. at 10-11 (emphasis in original).
Where a statement is not per se testimonial, it may nonetheless be inadmissible as testimonial in fact. Without the benefit of more specific guidance from Crawford, the Supreme Judicial Court developed a test with which to analyze the testimonial qualities of out-of-court statements that do not fall into one of the per se categories. Gonsalves at 11. Statements are testimonial in fact if a reasonable person in the declarant’s position would anticipate the statement being used against the accused in investigating and prosecuting a crime. Commonwealth v. Gonsalves, 445 Mass. at 12-13.[9] Determination of whether a statement is testimonial in fact requires the Court to conduct a fact-specific inquiry which focuses on the declarant’s intent by evaluating the specific circumstances in which the statement was made. See id. at 13.[10]
The Commonwealth concedes, as it must based upon Gonsalves, that Kamm’s statements to Himmer are testimonial. By the time Himmer arrived at the solarium to speak with Kamm, he was not securing a volatile scene or establishing the need for medical care. Nothing in the record suggests that Kamm offered the statements to Himmer without prompting. Rather, Himmer’s reason for going to the solarium was to interview Kamm. Accordingly, under the Supreme Judicial Court’s recently announced interpretation of Crawford in Gonsalves, Kamm’s statements to Himmer should not have been admitted due to Kamm’s unavailability at trial and the defendant’s lack of an opportunity to cross-examine her, and their admission violated the defendant’s Sixth Amendment right to confrontation. See Commonwealth v. Gonsalves, 445 Mass. at 13.[11]
The same is not true of Kamm’s statements to Brown. Kamm’s statements to Brown were not testimonial per se, as they were not made in response to law enforcement questioning. At issue, then, is whether Kamm’s statements to Brown were testimonial in fact. In considering whether a reasonable person in Kamm’s place would anticipate that her statements to Brown would be used in the investigation and prosecution of the defendant, the Court attempts to discern Kamm’s intent and state of mind by examining the specific circumstances in which she made the statements. Commonwealth v. Gonsalves, 445 Mass. at 12.[12] The nightmarish series of events which Kamm witnessed close up immediately before making the statements to Brown and Kamm’s fragile physical and emotional condition at that time indicate that Kamm’s statements to Brown were not testimonial in fact. From her hospital bed, Kamm first saw her husband and Vajda engage in a brutal fight, with Vajda at one point standing over the defendant and inflicting blows to his face and arm. Within a few minutes or perhaps less than a minute, Kamm watched as on the floor next to her, her husband pulled out a gun and shot it, first into Vajda’s abdomen and, seconds later, into the back of Vajda’s head. Kamm then saw her husband unload the gun and place it on the bed tray table next to her, try to hug her, then leave the room. To this bloody scene, a flurry of emergency medical personnel and equipment flooded the room (including two or three physicians, at least two nurses, and two other medical aides) in a frantic and desperate attempt to revive Vajda, using intubation, a defibrillator, and intravenous treatment, even though Vajda was not breathing and had only fading heart activity. As these events unfolded within three feet of Kamm, she became hysterical, shaking tremendously, assuming a fetal position, sobbing, and exacerbating her weakened respiratory condition. Then, while Brown guided Kamm into the corridor, Kamm saw the defendant again. Brown did not solicit any of Kamm’s statements, but instead tried to calm her due to her difficulty in breathing in these traumatic circumstances.
Kamm’s physical condition and behavior underscore the nontestimonial nature of her statements to Brown. As a hospitalized pneumonia patient hooked up to an IV, Kamm was physically weak, yet during her statements to Brown, she had not yet received the oxygen deemed necessary by Dr. Kvatemik. Her respiratory condition was deteriorating to the point where, approximately ten minutes later, she appeared to be coughing so hard that she nearly vomited. Her speech to Brown was markedly repetitive, seeming almost out of control.
One might blithely conclude that a reasonable person in the position of Kamm would recognize that a percipient witness’s first description of a killing would *140 inevitably be used in the investigation and prosecution of the crime. I disagree. If those moments right after Kamm’s husband killed her lover had been captured on videotape, one would observe our out-of-court declarant’s hysterical verbal response to human tragedy as Kamm utilized language to reconcile what she had witnessed with her new reality. One would hear her raw screams and gasps for breath, see the pool of blood, smell the gunpowder, feel the tubes attached to her fatigued body, and recognize that Kamm was not cognizant of the implications of her actions. She was not emotionally able to contemplate the potential use of her words. Who would be? She was struggling for emotional and physical survival.
Of course, now, years later, in the sterile environment of a courtroom in an attempt to recreate a model of the reality right after Kamm saw her lover die on a hospital room floor at the hands of her husband, the moment seems as sterile as a surgeon’s instruments. Such an insipid description is detached from reality. Rather, the dictate of Gonsalves is to understand how a reasonable person would expect her words to be used as they are spoken, not as they might be viewed in a dispassionate recreation of reality years later.
The Court finds that Kamm’s statements to Brown were made in a context so shocking and disturbing that a reasonable person in Kamm’s position would not anticipate their use in an investigation or prosecution of the defendant. Accordingly, the Court finds that they were not testimonial statements and that their admission did not violate the defendant’s Sixth Amendment right to confrontation.
That does not end the analysis. The defendant is only entitled to relief on his motion for new trial if the erroneous admission of Kamm’s statements through Himmer amounted to error which was not harmless and if the Crawford rule applies retroactively to his case. See Commonwealth v. White, 392 Mass. 282, 295 (1984) (defendant entitled to new trial based on retroactively applicable constitutional principle unless error was harmless beyond a reasonable doubt).
B. Harmless Error Analysis
Constitutional errors that were preserved or treated as preserved are reviewed to determine whether or not they were harmless beyond a reasonable doubt, unless the constitutional right infringed is so basic to a fair trial that its infraction can never be treated as harmless error. Commonwealth v. Vinnie, 428 Mass. 161, 163 (1998). The Court treats the erroneous admission of Kamm’s statements to Himmer as preserved because the constitutional theory on which the defendant relies was not sufficiently developed at the time of his trial or direct appeal so as to afford him a genuine opportunity to raise his claim at those junctures of the case. See Commonwealth v. Randolph, 438 Mass. at 293-94. Moreover, the defendant unequivocally opposed the admission of that evidence at trial on Sixth Amendment grounds.
Because the denial of the opportunity to cross-examine an adverse witness does not fit within the limited category of constitutional errors that are deemed prejudicial in every case, the admission of testimony obtained in violation of a defendant’s confrontation rights will not constitute reversible error “if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt.” Commonwealth v. Miles, 420 Mass. 67, 73 (1995), quoting Delaware v. Van Arsdall, 475 U.S. 673, 681-82 (1986). See also Arizona v. Fulminante, 499 U.S. 279, 310 (1991) (where error was in trial process rather than a structural defect affecting the framework within which the trial proceeded, the court determines whether the error was harmless); Commonwealth v. Johnson, 417 Mass. 498, 505 n.6 (1994) (“A violation of the art. 12 right to confront witnesses face to face may be subject to harmless error analysis”).
In assessing whether the admission of Kamm’s statements to Himmer was harmless beyond a reasonable doubt, the Court examines several factors, including “the importance of the evidence in the prosecution’s case, the frequency of the reference to the evidence, whether it was cumulative of other evidence and whether the other evidence against the defendant was overwhelming." Commonwealth v. Rosario, 430 Mass. 505, 511 (1999). The Commonwealth bears the burden of showing that the wrongfully admitted evidence did not contribute to the verdict. Commonwealth v. Rodriguez, 445 Mass. 1003, 1004 (2005).
The defendant contends that Himmer’s testimony recounting Kamm’s statements prejudiced him because it included “a dramatic description of the second shot, with Vadja’s [sic] head allegedly in the defendant’s arms as the defendant proclaims ‘Now I’m going to get you’ and fires.” According to the defendant, Himmer’s testimony provided important corroboration and contextual detail to Brown’s account, and these statements were the only evidence directly contradicting the defendant’s version of the shooting as self-defense.
The defendant’s argument is unavailing. Cook also testified that he heard and saw the defendant say “Now you’re going to get it” or “Now you’ve done it,” and McCarthy heard a man in Kamm’s room say, “Now you’re going to get it.” Although Cook and McCarthy testified that they heard these words before the first rather than second gunshot, the Court finds that their testimony substantially renders cumulative Kamm’s statement to Himmer that the defendant said “Now I’m going to get you” before shooting Vajda. See Commonwealth v. Vinnie, 428 Mass. at 173 (although judge erred in admitting witness’s testimony, it was cumulative of percipient *141 testimony of two other witnesses, and its admission was therefore not prejudicial).
Nor did Himmer’s testimony of Kamm’s statements portray a far more dramatic picture of the shooting than other evidence properly before the jury. Dr. Kvaternik and Bryant testified that they saw the defendant holding a gun to the back of Vajda’s head. On cross-examination, Bryant admitted that he had told police on the night of the shooting and a grand jury a month later that the defendant had Vajda in a headlock. Brown testified that Kamm told her that the defendant was holding Vajda’s head in his arms just before shooting Vajda in the head. I find that Kamm’s statement to Himmer regarding the defendant holding Vajda’s head was cumulative of other evidence before the jury and its erroneous admission did not have any effect on the verdict. See id. Therefore, in consideration of the whole record, the Court finds that the admission of Kamm’s statements through Himmer was harmless beyond a reasonable doubt and did not change the outcome of the trial. See Commonwealth v. Alphas, 430 Mass. 8, 25 (1999); Commonwealth v. Miles, 420 Mass. at 73.
C. Retroactivity of Crawford
Even if the error in the admission of Kamm’s statements to Himmer was not harmless beyond a reasonable doubt, the Court would not apply Crawford retroactively. Generally, new criminal procedural rules do not apply to collateral attacks upon convictions that became final before the new rules were announced. Teague v. Lane, 489 U.S. 288, 310 (1989). A new rule of constitutional law is retroactive in collateral proceedings only if it falls within one of two exceptions: (1) it places certain conduct beyond the reach of criminal law, or (2) it establishes one of the “watershed rules of criminal procedure” which implicates the fundamental fairness and accuracy of the trial and without which the likelihood of an accurate conviction is seriously diminished. Id., 489 U.S. at 311-13. See also Commonwealth v. Bray, 407 Mass. 296, 303 (1990); Commonwealth v. Sullivan, 425 Mass. 449, 454 n.9 (1997); Commonwealth v. Hampton, 64 Mass.App.Ct. 27, 31 (2005).
A Supreme Court decision announces a new rule if “the result was not dictated by precedent existing at the time defendant’s conviction became final.” Butler v. McKellar, 494 U.S. 407, 412 (1990). At the time the defendant’s conviction became final,[13] the existing precedent, Ohio v. Roberts, permitted the introduction of an out-of-court statement against the defendant if the declarant were unavailable at trial as long as (1) the statement bore adequate indicia of reliability by falling within a firmly rooted hearsay exception, or (2) the statement contained “particularized guarantees of trustworthiness” such that “there [was] no material departure from the reason [for] the general rule” requiring confrontation. Ohio v. Roberts, 448 U.S. 56, 65-66 (1980). Roberts did not interpret the Confrontation Clause to require that the defendant have an opportunity to cross-examine a declarant before his or her testimonial hearsay could be admitted against the defendant. See id. Crawford reconceived the Supreme Court’s Confrontation Clause jurisprudence so that testimonial out-of-court statements of a person who does not appear as a witness at trial may not be introduced against a defendant to establish the truth of what was stated unless the declarant is unable to testify at the trial and the defendant had a prior opportunity to cross-examine the declarant. Crawford v. Washington, 541 U.S. 36, 54, 68 (2004). Crawford thus announces a new rule.[14]
The retroactivity of the Crawford rule therefore hinges upon whether or not it rises to the level of a watershed rule of criminal procedure which implicates the fundamental fairness of the criminal proceeding and which improves the accuracy of the criminal process. See Teague v. Lane, 489 U.S. at 312-13. There is no question that the defendant’s confrontation right under the Sixth Amendment is fundamental. See, e.g., Commonwealth v. Miles, 420 Mass. at 71 (“The right to confrontation and cross-examination ‘is an essential and fundamental requirement for the kind of fair trial which is this country’s constitutional goal’ ”).[15] Cf. Commonwealth v. Amirault, 424 Mass. 618, 639 (1997) (“art. 12 addresses a fundamental right of the accused”). The right to confrontation is not absolute, but is paramount except in limited circumstances. Commonwealth v. Bergstrom, 402 Mass. 534, 546 (1988).
The fundamental nature of the Sixth Amendment right, however, does not compel the conclusion that the Crawford rule satisfies Teague's test for retroactivity. “That a new procedural rule is ‘fundamental’ in some abstract sense is not enough; the rule must be one ‘without which the likelihood of an accurate conviction is seriously diminished.’ ” Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. 2519, 2523, 159 L.Ed.2d 442, 449 (2004), quoting Teague v. Lane, 489 U.S. at 313; Gilmore v. Taylor, 508 U.S. 333, 345 (1993) (small core of rules to be applied retroactively are those requiring the observance of procedures which are implicit in the concept of ordered liberty); Sawyer v. Smith, 497 U.S. 227, 244 (1990) (because rule designed to enhance the accuracy of capital sentencing was added to an existing guarantee of due process protection against fundamental unfairness, rule was not an absolute prerequisite to fundamental fairness and thus not retroactive under Teague).
Consistent with its view that the class of retroactively applicable rules “is extremely narrow,” Schriro v. Summerlin, 542 U.S. 348, 124 S.Ct. at 2523, the Supreme Court has only in rare cases held that new rules are retroactive on collateral review. The right to counsel in criminal trials, as “one of the safeguards of the Sixth Amendment deemed necessary to insure *142 fundamental human rights of life and liberty,” see Gideon v. Wainwright, 372 U.S. 335, 343 (1963), was held to apply retroactively. See Pickelsimer v. Wainwright, 375 U.S. 2 (1963). The Supreme Court has also held that the new rule in Bruton v. United States, 391 U.S. 123 (1968), applied retroactively because the admission of a non-testifying codefendant’s statement implicating the defendant without an opportunity for cross-examination violated his Sixth Amendment right and was a “serious flaw” that “went to the basis of fair hearing and trial because the procedural apparatus never assured the [petitioner] a fair determination” of his guilt or innocence. Roberts v. Russell, 392 U.S. 293, 294-95 (1968) (quotations and citation omitted).
The Court is persuaded by the thoughtful analysis of the majority of Circuit Courts addressing this question that the new rule in Crawford lacks the “watershed" quality required for retroactive application under Teague.[16] Although Crawford plainly expands the implementation of the protections previously established under the Sixth Amendment, it cannot fairly be viewed as “altering] our understanding of the bedrock procedural elements” of the adjudicatory process so as to vitiate the fairness of the defendant’s conviction. See Teague, 489 U.S. at 311. Because Crawford bars the admission of some highly reliable out-of-court statements that were admissible under Roberts, it is not clear that the Crawford rule will significantly improve the accuracy of convictions. See Bintz v. Bertrand, 403 F.3d 859, 867 (2005), citing Mungo v. Duncan, 393 F.3d 327,335-36 (2d Cir. 2004). The Crawford rule thus falls short of being central to an accurate determination of innocence or guilt “without which the likelihood of an accurate conviction is seriously diminished.” See Teague v. Lane, 489 U.S. at 313; Schriro v. Summerlin, 542 U.S. at_, 124 S.Ct. at 2523.
That Crawford does not establish a new procedure so fundamental so as to be “implicit in the concept of ordered liberty,” see Gilmore v. Taylor, 508 U.S. at 345, is also evident from the standard of review applicable to Confrontation Clause violations. In contrast to constitutional errors which by their nature infect the framework of a criminal proceeding and thus are always prejudicial and compel reversal, Sixth Amendment violations are not always prejudicial constitutional errors and are reviewed under the harmless error standard. See, e.g., Delaware v. Van Arsdall, 475 U.S. at 681-82; Commonwealth v. Miles, 420 Mass. at 73; Commonwealth v. Johnson, 417 Mass. at 505 n.6. The fact that Sixth Amendment errors may be excused depending upon the evidence at trial undercuts the argument that Crawford alters rights fundamental to due process. See Arizona v. Fulminante, 499 U.S. at 310; Murillo v. Frank, 402 F.3d at 791 (2005); Brown v. Uphoff, 381 F.3d 1219, 1226-27 (2004). Accordingly, Crawford does not apply retroactively.
II. Other Claimed Errors
On December 16, 2004, the Federal District Court of Massachusetts (Young, C.J.) dismissed the defendant’s petition for habeas corpus relief for failure to exhaust state court remedies. According to the defendant, the court determined “that some of the grounds raised had not been presented in the state court as federal issues and ordered that the defendant either proceed to seek exhaustion in the state court or withdraw the claims.” (U.S.Dist.Ct.Mass. No. l:04-cv10917-WGY.) Against that backdrop, the defendant reasserts the same three claims of error that he raised before the Appeals Court on direct review, but now recasts them as violations of his rights under the Sixth and Fourteenth Amendments to the United States Constitution, presumably in order to clear the path for a new habeas corpus petition.[17]
“A motion for new trial may not be used to compel the review of issues on which the defendant has already had appellate review or issues on which the defendant has foregone the opportunity.” Commonwealth v. Balliro, 437 Mass. 163, 166 (2002). Because the defendant did not raise in his direct appeal these federal constitutional claims he now advances, and does not contend that the constitutional theories upon which he relies with respect to these errors were not sufficiently developed at the time of his trial or direct appeal, they are waived. See Commonwealth v. Randolph, 438 Mass. at 294-95.[18] Although the defendant has failed to preserve those claims for review, the Court must nonetheless grant relief when it is uncertain that the defendant’s guilt has been fairly adjudicated. Id. at 294-95. As with the waived claims, the defendant’s other arguments which were reviewed and rejected on direct appeal may be reheard in the discretion of the judge, but such discretion should be restricted to “the extraordinary situations when ‘upon sober reflection, it appears that a miscarriage of justice might otherwise result.’ ” See Commonwealth v. Balliro, 437 Mass. at 166. This is not a case in which it appears that a miscarriage of justice might result if the Court did not rehear the waived arguments, and consequently the Court declines to exercise its discretion to do so.
Nothing in the record, the defendant’s arguments, or the development in case law creates an uncertainty as to whether the defendant’s guilt has been fairly adjudicated or whether there has been a substantial risk of a miscarriage of justice. See Commonwealth v. Balliro, 437 Mass. at 166. Accordingly, the defendant’s motion for new trial is denied.
ORDER
For the foregoing reasons, it is hereby ORDERED that the defendant’s motion for a new trial is DENIED.

 This case was tried before the Hon. Isaac A. Borenstein, who recused himself from ruling on the motion for new trial.

 The right to confrontation in English lawbegan to develop in the decades following the infamous trial and conviction of Sir Walter Raleigh on charges of treason. Lord Cobham, also charged with treason, implicated Raleigh in out-of-court statements which were used against Raleigh at trial. Raleigh unsuccessfully argued, “If you proceed to condemn me here by bare inferences, without an oath, without a subscription, without witnesses, upon a paper accusation, you tiy me by the Spanish Inquisition. If my accuser were dead or abroad, it were something but he liveth . .. Why, then, I beseech you, my Lords, let Cobham be sent for; let him be charged upon his soul; upon his allegiance to the King, and if he will then maintain his accusation to my face, I will confess myself guilty.” Note, Crawford v. Washington: Reclaiming the Original Meaning of the Confrontation Clause, 21 TouroL.Rev. 231, 232 n.9 (2005).

 Some evidence presented at trial indicated that the defendant’s vision without glasses was 20/200, but that this degree of nearsightedness would permit a person to see relatively clearly everything within a three-to five-foot distance. (Tr. Vol. 9, p. 103.) Other evidence indicated that the defendant’s vision in early March of 1999 was 20/800, which would mean that he could see at a five-foot distance what a person with perfect vision could see from 200 feet away. (Tr. Vol. 10, p. 11.)

 Cook described Vajda as the taller man fighting. Vajda measured 6 feet 1 inch tall, weighed 200 pounds, and was described as an athletic 56-year-old. The defendant was 5 feet 10 inches tall, 195 pounds and 60 years old at the time of the shooting.

 At the trial in this matter, Kamm’s statements were admitted as “excited utterances.” The Supreme Judicial Court now uses the term “spontaneous utterance” to refer to the exception involving statements variously described as “spontaneous declaration,” “spontaneous utterance,” and “excited utterance.” Commonwealth v. Gonsalves, 445 Mass. at 4 n.1.

 In his written ruling on the Commonwealth’s Motion to Admit Spontaneous Utterance Evidence, the trial judge found that Kamm’s statements to Brown qualified as spontaneous utterances. A statement is admissible under the spontaneous utterance exception to the rule against hearsay if “(1) there is an occurrence or event ‘sufficiently startling to render inoperative the normal reflective thought processes of the observer,’ and (2) if the declarant’s statement was ‘a spontaneous reaction to the occurrence or event and not the result of reflective thought.’ ” Commonwealth v. Santiago, 437 Mass. 620, 623 (2002), quoting 2 McCormick, Evidence §272, at 204 (5th ed. 1999). Consideration of whether the statement tends to qualify, characterize, and explain the underlying event is not a third requirement of the admissibility test, but rather a factor which illuminates the second part of the admissibility test. Commonwealth v. Santiago, 437 Mass. at 625-26. This Court agrees that Kamm’s statements to Brown were admissible as spontaneous utterances because the shocking events Kamm witnessed immediately before making these statements were sufficiently startling to render inoperative Kamm’s reflective faculties, so that her statements were a spontaneous and sincere response to the external shock she had just experienced. See Commonwealth v. Santiago, 437 Mass. at 623. Before trial, the defendant conceded at the hearing and in his written opposition to the Commonwealth’s Motion to Admit Spontaneous Utterance Evidence that most of Kamm’s statements to Brown which were later admitted at trial satisfied the requirements for the hearsay exception for spontaneous utterances. At that stage, in his direct appeal, and again in his motion for new trial, the defendant singles out as error the admission of Kamm’s statements to Brown regarding the defendant’s habit of wearing a gun on his leg because statements of habit are generally inadmissible and are about history rather than current observations. This argument was squarely rejected by the Appeals Court and therefore need not be addressed further here. See Commonwealth v. Kartell, 58 Mass.App.Ct. 428, 434 (2003).
Nor is there a reason to reassess whether Kamm’s statements to Himmer qualified as spontaneous utterances under Santiago, in light of this Court’s conclusion below. Regardless of whether they qualify as spontaneous utterances, these statements were inadmissible as violative of the Confrontation Clause of the Sixth Amendment, but their admission did not in any way affect the jury’s verdict and amounted to harmless error beyond a reasonable doubt.

 The Crawford Court also articulated, without expressly adopting, three general formulations of “testimonial”: (1) “ex parte in-court testimony or its functional equivalentthat is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially”; (2) “extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions”; and (3) “statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.” (Citations omitted.) Crawford v. Washington, 541 U.S. at 51-52.

 The Crawford Court’s decision to “leave for another day any effort to spell out a comprehensive definition of ‘testimonial’ ” did not appear to sit well with Chief Justice Rehnquist, who in a concurring opinion warned that “thousands of federal prosecutors and tens of thousands of state prosecutors need answers as to what beyond the specific kinds of ‘testimony’ the Court lists ... is covered by the new rule. They need them now, not months or years from now. Rules of criminal evidence are applied every day in courts throughout the country, and parties should not be left in the dark in this manner.” Crawford v. Washington, 541 U.S. 36, 75-76 (2004) (Rehnquist, C.J., concurring). See also Commonwealth v. Gonsalves, 445 Mass. at 32 n.6 (Sosman, J., concurring in part) (noting that Chief Justice Rehnquist’s concurring opinion recognized “the havoc that the present uncertainty [as to the meaning of testimonial] could wreak on the criminal justice system”).

 Although the third Crawford formulation of “testimonial" (see note 7, supra) focuses on the declarant’s reasonable belief (or not) that the statement would be available for use at a later trial, the scope of “testimonial” under Gonsalves extends much further, to any statement made by a declarant who should reasonably anticipate its use “in investigating and prosecuting the crime,” thereby encompassing “a vast array of informal statements that are not made for purposes of trial.” See Commonwealth v. Gonsalves, 445 Mass. at 28-30 (Sosman, concurring in part). The distinction is significant because, as noted by Justice Sosman, “[a]ny form of accusation or statement concerning criminal activity would cause a reasonable person to anticipate that an investigation will follow, but not every such accusation or statement is made with an eye toward trial.” Id. at 29.

 By example only, the Court provides a nonexhaustive list of factors, none of which is dispositive, for consideration in determining whether a statement is testimonial: (1) to whom was the statement made? (2) was the statement made in a public or private setting? (3) what was the emotional temperature of the declarant and the would-be witness? (4) was the out-of-court statement motivated by a need to address a perceived emergency or to provide information to aid in the investigation or potential prosecution of crime? (5) were police present when the statement was made? (6) what was the content of the statement? (7) was the statement unsolicited or made in response to a question?

 The defendant does not argue that the protections afforded by art. 12 of the Massachusetts Declaration of Rights are more extensive than those under the Sixth Amendment or that the Court’s analysis should differ depending on the constitutional source of the protection claimed. Therefore, the Court does not separately address the issue under art. 12. See Commonwealth v. Francis, 432 Mass. 353, 363 n.8 (2000), citing Commonwealth v. Keevan, 400 Mass. 557, 568 n.9 (1987). Indeed, the Supreme Judicial Court has interpreted the Massachusetts Declaration of Rights cognate provisions under the Confrontation Clause as providing no more protection than the Sixth Amendment in cases involving the rule against hearsay and its exceptions. See Commonwealth v. King, 445 Mass. 217, 236 (2005); Commonwealth v. Whelton, 428 Mass. 24, 28 (1998) (distinguishing between cases involving hearsay issues, in which the state and federal confrontation rights are coextensive, and cases such as Amirault, in which the confrontation right involved courtroom configuration and in which a defendant’s rights under art. 12 are greater than those under the Sixth Amendment).

 The defendant urges the Court to focus on the content of Kamm’s statements, while the Commonwealth emphasizes their context. Although one could imagine Kamm being aware at some level thather statements to Brown might later be used against the defendant, the defendant’s boundless reading of the testimonial in fact standard is inconsistent with the central holding of Gonsalves (“[t]he proper inquiiy is whether a reasonable person in the declarant’s position would anticipate the statement’s being used against the accused in investigating and prosecuting a crime”), rather than what the court in dicta says is the adopted approach (“it is a formulation that would find testimonial all statements the declarant knew or should have known might be used to investigate or prosecute the accused”). Commonwealth v. Gonsalves, 445 Mass. at 12 (emphasis in original).

 There is no dispute that the defendant’s conviction became final in 2003, before the Supreme Court issued Crawford. A conviction becomes final for purposes of Teague when “the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally decided.” See Beard v. Banks, 542 U.S. 406, 124 S.Ct. 2504, 2510 (2004). After the Appeals Court denied the defendant’s direct appeal on June 30, 2003, the Supreme Judicial Court denied further review on September 5, 2003. From that date, the defendant had ninety days, or until approximately December 5, 2003, to file a timely petition for a writ of certiorari. See 28 U.S.C. §2101(c) (allowing ninety days post-conviction for petitions for certiorari review). Cf. Caspari v. Bohlen, 510 U.S. 383, 390-91 (1994). This he did not do. Therefore, his conviction became final for purposes of Teague in early December of 2003, some four months before the Supreme Court issued Crawford v. Washington, on March 8, 2004.

 It remains an open question whether Roberts is applicable to nontestimonial hearsay. See Ferguson v. Roper, 400 F.3d 635, 639 (8th Cir. 2005) (“[t¡he Supreme Court’s discussion in Crawford raises some doubt whether the Roberts reliability analysis remains good law when applying the Confrontation Clause to nontestimonial hearsay”), citing Crawford, 541 U.S. at 52 (“where nontestimoniaJ hearsay is at issue, it is wholly consistent with the Framers’ design to afford the States flexibility in their development of hearsay law”). Compare Horton v. Allen, 370 F.3d 75, 84 (1st Cir. 2004).

 The rule against hearsay has been described by John Henry Wigmore as “a rule that may be esteemed, next to the jury trial, as the greatest contribution to a practical legal system.”

 Many Circuit Courts around the nation have weighed in on this issue, with nearly all determining that Crawford does not announce a watershed rule of criminal procedure. See Mungo v. Duncan, 393 F.3d 327, 336 (2d Cir. 2004) (Crawford is not a watershed rule because some of the substantial changes in the protection given by the Confrontation Clause under Crawford will likely impair the accuracy of the factfinding process although other changes under Crawford will likely improve it); Dorchy v. Jones, 398 F.3d 783, 788 (2005) (6th Cir. 2005); Murillo v. Frank, 402 F.3d 786, 790-91 (2005) (7th Cir. 2005) (Crawford is not watershed rule because (1) Supreme Court has only identified one decision, Gideon v. Wainwright, that would be so profound to trigger retroactive effect on collateral attacks, (2) Crawford is not an indispensable innocence-protecting decision, as it gives defendant a right to demand live testimony whether that demand frustrates or promotes accuracy; (3) Crawford does not state a truly vital rule of criminal procedure because in contrast to the right to counsel, for which violations lead to reversal without inquiiy into harmless error, courts examine evidence admitted without cross-examination to determine whether the error was harmless); Bintz v. Bertrand, 403 F.3d 859, 867 (7th Cir. 2005) (because Crawford does not guarantee accuracy or introduce any fundamentally new concepts to address the fairness or accuracy of a trial, it is an extension of the full constitutional protections of the Sixth Amendment); Brown v. Uphoff, 381 F.3d 1219, 1226-27 (10th Cir. 2004) (in contrast to Gideon v. Wainwright, Crawford does not alter our understanding of what constitutes basic due process, but merely sets out new standards for the admission of certain kinds of hearsay; moreover, Confrontation Clause errors are subject only to harmless error analysis and may be excused depending on the state of the evidence at trial). In contrast, a 9th Circuit panel has ruled that Crawford applies retroactively. See Bockting v. Bayer, 399 F.3d 1010, 1021 (9th Cir. 2005) (reasoning that (1) the Supreme Court describes the right to confrontation as a “bedrock procedural guarantee,” (2) the harmless error standard of review used to assess misapplication of constitutional rules is appropriate where the impact of the error is measurable but its use does not answer the question of whether the constitutional rule increases the likelihood of an accurate conviction or is a bedrock rule of procedure; and (3) because the Confrontation Clause is designed to promote accuracy, “the Crawford’ rule is one without which the likelihood of accurate conviction is seriously diminished). But see Bockting v. Bayer, 418 F.3d 1055, 1056-57 (9th Cir. 2005) (nine Circuit Court judges from the full court dissenting from the court’s denial of a petition for a hearing en banc challenged the retroactivity of Crawford, reasoning that Crawford merely reshaped the contours of the right to confrontation, and therefore was a far ciy from Gideon, which marked the difference between giving a defendant competent counsel versus giving him none at all).

 Specifically, the defendant contends that his rights under the Sixth and Fourteenth Amendments were violated by three trial errors: (1) the admission as spontaneous utterances of all of the statements made by Kamm to Himmer as well as Kamm’s statements to Brown that the defendant habitually carried his gun in a leg holster rather than in his pocket; (2) prosecutorial arguments and juiy instructions which permitted the jury to determine that the defendant, albeit acting in self-defense in firing the first shot, could be guilty of manslaughter with respect to the second shot; and (3) the exclusion of evidence of the victim’s past behavior.

 The Court has no intention of resurrecting these claims of error, nor could it do so, in light of the demise of the power of resurrection in criminal cases. See Commonwealth v. Bly, 444 Mass. 640, 651 (2005) (“the power of resurrection is no longer viable and will no longer be recognized in criminal cases”).